# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

## MADGE KIRKHAM FELL, ET AL. v. GLORIA RAMBO

**Direct Appeal from the Chancery Court for Marshall County**
**No. 9147     Lee Russell, Judge**

---

### No. M1999-01039-COA-R3-CV - Decided May 5, 2000

---

This appeal involves a dispute over the proceeds of the sale of a family farm by a life tenant with an unlimited power of disposition. Following the life tenant's death, the remaindermen named in the life tenant's husband's will filed suit in the Chancery Court for Marshall County against the executrix of the life tenant's estate, the estate itself, and the beneficiaries named in the life tenant's will asserting that the life tenant lacked capacity to sell the farm, that the executrix had unduly influenced the life tenant to sell the farm, and that the executrix had tortiously interfered with their inheritance from the life tenant's husband. The trial court, sitting without a jury, found no lack of capacity or undue influence but determined that the remaindermen have an interest in the proceeds of the sale of the farm. The trial court also awarded attorney's fees to the lawyer the remaindermen had discharged earlier in the proceeding. The life tenant's estate and her executrix now appeal the conclusion that the remaindermen named in her husband's will have an interest in the proceeds of the sale; while the remaindermen appeal from the dismissal of their lack of capacity, undue influence, and intentional interference with inheritance claims and the award of fees to their former lawyer. We have determined that the trial court correctly concluded that the life tenant was capable of selling the farm, that her executrix did not unduly influence her decision, and that the remaindermen's former attorney was entitled to payment. We have also determined that the life tenant's sale of the farm terminated the remaindermen's interest as a matter of law. Accordingly, we reverse the judgment awarding the remaindermen $269,420.89 and remand the case to the trial court for further proceedings.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed in Part and Reversed in Part.

KOCH, J., delivered the opinion of the court, in which CAIN, J. and COTTRELL, J. joined.

Barry B. White and Robert O. Binkley, Lewisburg, Tennessee, for the appellant, Gloria Rambo.

William B. Bradley, Brentwood, Tennessee, and Kevin S. Key, Nashville, Tennessee, for the appellees, Madge Kirkham Fell, Betty Kirkham Bowland, Margaret Sanford Mullens, and Bernice Kirkham Bowers.

John R. Reynolds, Nashville, Tennessee, Pro Se.

**OPINION**

John E. Crockett and Nannie Bell Crockett were a childless married couple who lived in Williamson County. On March 11, 1959, Mr. Crockett executed a will giving Ms. Crockett a life tenancy in all of his real and personal property, including his 173-acre farm near College Grove (the "Crockett farm"). The will authorized Ms. Crockett "to sell, mortgage, use or consume such property, for her needs in her sole and absolute discretion." It also provided that, at Ms. Crockett's death, the remainder "which has not been disposed of" by Ms. Crockett would go to Mr. Crockett's sister and his nieces and nephews living at Ms. Crockett's death.[1] Mr. Crockett died in September 1963. His will was duly probated vesting in Ms. Crockett the life estate in the Crockett farm and Mr. Crockett's other property.[2]

Ms. Crockett continued to live by herself on the Crockett farm following Mr. Crockett's death. In 1986, at the age of eighty-eight, she executed a general power of attorney in favor of her niece, Gloria Rambo. Ms. Rambo remained Ms. Crockett's attorney-in-fact until Ms. Crockett's death. In 1991, Ms. Crockett suffered a fall, and was briefly hospitalized. After her release from the hospital, she moved off the Crockett farm to the Main Street Retirement Home in Cornersville near Ms. Rambo's home in Belfast. Ms. Rambo continued to visit Ms. Crockett regularly; while other family members visited less frequently.

On July 9, 1991, at the age of ninety-three, Ms. Crockett executed a will. The will contains several relatively small bequests and then leaves the residue of Ms. Crockett's estate to her niece and nephew, Ms. Rambo and Bobby T. Garrett. The will leaves nothing to the remaindermen named in Mr. Crockett's will. Ms. Crockett was not related to these remaindermen except by marriage and did not have much contact with them. Finally, the will appoints Ms. Rambo as executrix.[3]

In 1992, Henry Preston Ingram and Elizabeth A. Ingram, owners of the real property adjacent to the Crockett farm, approached Ms. Rambo with an offer to purchase the Crockett farm. Ms. Rambo initially told the Ingrams that the farm was not for sale. On the Ingrams' second or third attempt, Ms. Rambo brought the offer to Ms. Crockett who approved it. While Ms. Crockett had sufficient funds to support herself, she decided to sell the farm because she realized that she was not

---

[1]The will listed these individuals as Ruth Crockett Claiborne, William E. Sanford, Margaret Sanford Mullens, Leo Sanford, Elizabeth Pettus Jones, Herschel C. Pettus, Madge Kirkham Fell, Bernice Kirkham Bowers, and Betty Kirkham Bowland.

[2]Apart from the Crockett farm, Mr. Crockett died with assets worth $8,646.36. He also had debts amounting to $2,427.26.

[3]This will contains substantially the same provisions as a will drafted earlier in 1991 by John Wallace, a Lewisburg attorney. Mr. Wallace was retained by Ms. Rambo and never met Ms. Crockett. However, when Ms. Crockett executed the will that was eventually submitted to probate, she was independently advised by the firm of Hartzog, Silva & Davies in Franklin, Tennessee.

going to be able to return to the farm to live. In early 1993, Ms. Crockett and the Ingrams signed a contract for sale of the Crockett farm, and Ms. Crockett conveyed the farm to the Ingrams for $311,292. The net sale proceeds were approximately $307,000.

Ms. Crockett died on April 1, 1994. The following month, Ms. Rambo, acting as Ms. Crockett's personal representative, petitioned to probate Ms. Crockett's will. In September 1994, Madge Kirkham Fell and Betty Kirkham Bowland, two of the remaindermen in Mr. Crockett's will, ("remaindermen") filed suit in the Chancery Court for Marshall County seeking a declaration that they have an interest in all the real and personal property that Ms. Crockett inherited from her late husband that had not been used or consumed for her needs during her lifetime. Two additional remaindermen in Mr. Crockett's will later intervened as plaintiffs.[4] The persons named as defendants in this declaratory judgment action were Ms. Rambo, in her capacity as Ms. Crockett's personal representative and as a residuary beneficiary in her will, and the other beneficiaries named in Ms. Crockett's will.

The ensuing litigation became bitterly personal. The remaindermen accused Ms. Rambo of inveigling Ms. Crockett to sell the Crockett farm for her own personal gain, of mismanaging Ms. Crockett's money, and of forgery. On June 20, 1997, the trial court filed a memorandum opinion concluding that the remaindermen had, as a matter of law, an interest in the proceeds of the sale of the Crockett farm.[5] Accordingly, the trial court directed that three certificates of deposits totaling $207,000 of the proceeds of the sale of the farm be deposited with the clerk and master. The court also appointed an administrator ad litem for Ms. Crockett's estate, granted the remaindermen access to the estate's records and accounts and to Ms. Rambo's personal account records, and directed Ms. Rambo to provide the remaindermen with a reconciliation of several certificates of deposit.

The trial court conducted a four-day trial in June and July 1998 on the following issues: (1) whether the remaindermen's interest in the proceeds of the sale of the Crockett farm should be reduced by Ms. Crockett's living expenses between the sale of the farm and her death; (2) whether any of Mr. Crockett's personal property remained in Ms. Crockett's possession at the time of her

---

[4]Bernice Kirkham Bowers and Debbie Little, the daughter of Margaret Sanford Mullens, intervened as plaintiffs in April 1998. Ms. Rambo has moved to dismiss Ms. Little as a party to this appeal on the grounds that Ms. Little did not request to be made a party and that the trial court never added her as a party. However, realizing that she overlooked Ms. Little's April 7, 1997 motion to intervene as well as the agreed order dated March 18, 1998, allowing Ms. Little to intervene as a party, Ms. Rambo subsequently moved to dismiss her motion to dismiss Ms. Little's appeal. Accordingly, her motion to dismiss Ms. Little as a party to this appeal is dismissed, with costs taxed to Ms. Rambo, and Ms. Little's motion to be substituted as a party in the place of her mother is granted.

[5]The trial court later granted Ms. Rambo permission to seek an interlocutory appeal regarding the remaindermen's interest in the proceeds of the sale of the Crockett farm. However, on April 2, 1998, this court declined to accept the interlocutory appeal. *See Fell v. Rambo*, No. 01A01-9803-CH-00148 (Tenn. Ct. App. Apr. 2, 1998).

death; (3) whether Ms. Crockett was incompetent to sell the farm; and (4) whether Ms. Rambo had unduly influenced Ms. Crockett to sell the farm or had tortiously interfered with the remaindermen's inheritance.[6]  Between July 7, 1998 and May 13, 1999, the trial court issued a series of four memorandum opinions disposing of these issues.  The court found that Ms. Rambo had accounted for all the money she had managed for Ms. Crockett and that Ms. Rambo "did not steal a dime from the estate."  Next, the court found that Ms. Crockett was competent to sell the farm.  The trial court also found that Ms. Rambo had not unduly influenced Ms. Crockett's decision to sell the farm or intentionally interfered with the remaindermen's interest under Mr. Crockett's will.  In addition, the court concluded that none of Ms. Crockett's living expenses had been paid from the proceeds of the sale of the farm.  Finally, the trial court awarded the remaindermen a judgment for $269,420.89.[7]  The trial court also directed the clerk and master to continue holding the proceeds of sale of the farm that had earlier been deposited into court.

Ms. Rambo appeals as of right from the trial court's decision that the remaindermen were entitled to the proceeds of the sale of the Crockett farm.  The remaindermen, in turn, take issue with the trial court's conclusions that Ms. Crockett was competent to sell the farm and that Ms. Rambo had not exerted undue influence over Ms. Crockett and with the trial court's refusal to find that Ms. Rambo tortiously interfered with their inheritance.  The remaindermen also take issue with the trial court's decision to award $8,750 to their former lawyer.

The litigation in the trial court has not ended despite this appeal.  Four days after this court heard oral arguments in this case, the remaindermen filed a Tenn. R. Civ. P. 60.02 motion in the trial court seeking relief from the judgement based on allegations that Ms. Rambo had committed "substantial fraud" that was germane to the undue influence issue and that the interest earned on the certificate of deposit should be recalculated.  Approximately two weeks later, the remaindermen filed another motion requesting the trial court to recuse itself on the ground that it had declined to enforce its own orders relating to the custody of the certificates of deposit, the filing of an interim accounting, and the disbursement of funds.  After the trial court denied both motions, the remaindermen filed a Tenn. R. App. P. 10 extraordinary appeal taking issue with the trial court's denial of the motions and with its earlier decision against releasing to them the funds being held by the clerk and master.  Ms. Rambo also moved to dismiss the representative of one of the remaindermen as a party to this appeal.  We have consolidated the application for the extraordinary appeal with the Tenn. R. App. P. 3 appeal as of right.  This opinion addresses the issues raised in the

---

[6]The remaindermen did not assert a claim for tortious interference with their inheritance until they filed their pre-trial brief on June 26, 1998 – almost four years after they filed their complaint.  They also alluded to this theory during their opening statements on the first day of trial.

[7]This judgment included the net proceeds from the sale of the Crockett farm ($307,000) + the interest to date on the three certificates of deposit ($58,573.89) – the capital gains tax due on the sale of the farm ($73,181.00) – the income tax on the interest earned by the three certificates of deposit ($14,222.20) – the fees awarded to the remaindermen's former lawyer ($8,750.00).

appeal as of right; while the issues raised in the extraordinary appeal are addressed in a separate order issued contemporaneously with this opinion.

# I.
## THE REMAINDER INTEREST IN MR. CROCKETT'S ESTATE

The disposition of the proceeds of the sale of the Crockett farm depends upon which version of Tenn. Code Ann. § 66-1-106 (1993) applies to this case. The trial court applied the current version of the statute which mandates that the proceeds of the sale of property by a life tenant with unlimited power of disposition that are not required for payment of the life tenant's debts are held in trust for the benefit of the remaindermen of the will creating the life estate. Ms. Rambo asserts that the trial court should have applied the pre-1981 version of Tenn. Code Ann. § 66-1-106 which terminated a remainder interest when a life tenant with unlimited powers of disposition sold the property subject to the life estate. Ms. Rambo is correct.

## A.

At common law, the grant of a life estate, coupled with the grant of a noncontingent, unlimited power of disposition to the life tenant, vested fee simple title in the life tenant in the absence of other language in the will indicating a contrary intent. By vesting fee simple title in the life tenant, the common-law rule extinguished reversionary or remainder interests automatically by operation of law. *See Vandeventer v. McMullen,* 157 Tenn. 571, 573, 11 S.W.2d 867, 867 (1928); *Daly v. Daly*, 142 Tenn. 242, 247-48, 218 S.W. 213, 214 (1920); *Bradley v. Carnes*, 94 Tenn. 27, 30, 27 S.W. 1007, 1008 (1894). While the courts recognized and followed this common-law rule, they also noted that it occasionally defeated the apparent intent of the testator. *See Ogle v. Ogle*, 880 S.W.2d 668, 669 (Tenn. 1994); *Hobbs v. Wilson*, 614 S.W.2d 328, 330 (Tenn. 1980); *Mauk v. Irwin*, 175 Tenn. 443, 445, 135 S.W.2d 922, 922 (1940).

The General Assembly modified the common-law rule when it enacted the 1932 Code of Tennessee. This code provided that

> When the unlimited power of disposition, qualified or unqualified, not accompanied by any trust, is given expressly, in any written instrument, to the owner of any particular estate for life or years, legal or equitable, such estate is changed into a fee absolute as to right of disposition and rights of creditors and purchasers, but subject to any future estate limited thereon or executory devise thereof, in event and so far as the power is not executed or the property sold for the satisfaction of debts during the continuance of the particular estate.

2 Code of Tennessee § 8093 (1932).[8]  Under the provision, a life tenancy with an unlimited power of disposition did not automatically vest fee simple title in the life tenant.  The remainder interest remained viable unless the life tenant exercised the power of disposition or the property was sold to satisfy debts accrued during the life tenancy.  *See Hall v. Hall*, 604 S.W.2d 851, 855 (Tenn. 1980); *Leach v. Dick*, 205 Tenn. 221, 224-25, 326 S.W.2d 438, 440 (1959); *Thompson v. Turner*, 186 Tenn. 241, 245-46, 209 S.W.2d 25, 27 (1948); *Abernathy v. Adams*, 31 Tenn. App. 559, 567, 218 S.W.2d 747, 750 (1948).  Conversely, if the life tenant disposed of the property, or the property was sold to satisfy debts, the remainder interest was extinguished and did not transfer the proceeds of sale to the remaindermen.  *See Hobbs v. Wilson*, 614 S.W.2d at 330-31; *Jones v. Jones*, 225 Tenn. 12, 16-17, 462 S.W.2d 872, 874 (1971).

In 1981, following the Tennessee Supreme Court's decisions in *Hobbs v. Wilson* and *Hall v. Hall*, the General Assembly again changed the rule governing life estates with unlimited powers of disposition.[9]  This amendment added the following language to the statute:

> provided, [however,][10] that any proceeds from the sale of such estate, not needed for the satisfaction of debts of such owner during the continuance of the particular estate, shall be held in trust for such owner for the beneficiaries of the remainder interest and the purposes stated in such written instrument.

Tenn. Code Ann. § 66-1-106.  This amendment at least partially modifies the holding in *Hobbs v. Wilson*.  As a result, remaindermen now have a statutory right to receive the proceeds of the sale of any property held by a life tenant with an unlimited power of disposition that are not used to pay the debts of the life tenant accrued during the life tenant's life.

**B.**

The ultimate success of the remaindermen's case here depends upon which version of the statute governing life estates with unlimited powers of disposition applies.[11]  If the pre-1981 version

---

[8]An identical provision appears in the portion of the Code pertaining to conveyances of estates.  *See* 2 Code of Tennessee § 7603 (1932).  It was last codified in its original form in Tenn. Code Ann. § 64-106 (1976).

[9]*See* Act of June 3, 1981, ch. 450, 1981 Tenn. Pub. Acts 679.  One of the sponsors of this bill had also represented the remaindermen in *Hobbs v. Wilson*.

[10]The word "however" that appeared in the bill as enacted was removed during the codification process.

[11]The parties have focused their arguments throughout this litigation on the application of Tenn. Code Ann. § 66-1-106 and its predecessors.  Neither party has argued that Mr. Crockett's will

(continued...)

of the statute applies, the residual beneficiaries named in Ms. Crockett's will are entitled to the proceeds of the sale of the Crockett farm because Ms. Crockett exercised her power of disposition during her lifetime. If the post-1981 version applies, the residual beneficiaries named in Mr. Crockett's will prevail because of their statutory right to any proceeds of the sale of the Crockett farm that are not used to pay Ms. Crockett's debts incurred during her lifetime.

When the courts are called upon to construe a will, they must attempt to discover the testator's intention, and they must give effect to that intention unless it contravenes some rule of law or public policy. *See Stickley v. Carmichael*, 850 S.W.2d 127, 132 (Tenn. 1992); *Daugherty v. Daugherty*, 784 S.W.2d 650, 653 (Tenn. 1990). Although construction of a will requires consideration of the circumstances surrounding its execution, *see Daugherty v. Daugherty*, 784 S.W.2d at 653; *Bell v. Shannon*, 212 Tenn. 28, 40, 367 S.W.2d 761, 766 (1963), the courts must construe the will "to speak and take effect as if it had been executed immediately before the death of the testator, . . . unless a contrary intention appear by its words in context." Tenn. Code Ann. § 32-3-101 (1984).[12] *See Calhoun v. Campbell*, 763 S.W.2d 744, 748 (Tenn. 1988); *Bell v. Shannon*, 212 Tenn. at 40, 367 S.W.2d at 766; *State v. Felts*, 151 Tenn. 390, 394, 270 S.W. 77, 78-79 (1925). *See also* 1 Jack W. Robinson, Sr. & Jeff Mobley, *Pritchard on the Law of Wills and Administration of Estates* § 417 (5th ed. 1994).

The courts also presume that the testator knew the law existing at the time, as well as the law's effect on the construction of his or her will. *See Latta v. Brown*, 96 Tenn. 343, 351, 34 S.W. 417, 419 (1896); *Hearn v. Alexander*, 3 Tenn. Cas. (Shannon) 224, 229-30 (1875); *Hill v. Maloney*, 21 Tenn. App. 216, 220-21, 108 S.W.2d 791, 793-94 (1937). Accordingly, in construing a will, the courts apply the law as it stood when the testator died because "until his death, the testator has the opportunity to change his will to conform to existing law." *Third Nat'l Bank v. Stevens*, 755 S.W.2d 459, 462 (Tenn. Ct. App. 1988). A legislative enactment after the testator's death cannot change the

_____

[11](...continued)
did not give Ms. Crockett an unlimited power of disposition sufficient to trigger Tenn. Code Ann. § 66-1-106 or its predecessors. This is understandable in light of the similarity of the language in Mr. Crockett's will to the language construed in *Hobbs v. Wilson*, 614 S.W.2d 328 (Tenn. 1980) and the characterization of similar language as an unlimited power of disposition in 2 Harry Phillips, *Pritchard on the Law of Wills* § 962 (3d ed. 1955). Because the parties have not raised the question, we do not address directly in this appeal whether Mr. Crockett's will gave Ms. Crockett an unlimited power of disposition.

[12]The General Assembly enacted Tenn. Code Ann. § 32-3-101 to alter the common-law rule that a will devising real property spoke as of the time of its execution. The common law rule meant that real property acquired after execution of a will did not pass under the will. *See Nashville Trust Co. v. Grimes*, 179 Tenn. 567, 574-75, 167 S.W.2d 994, 997 (1943); *Nichols v. Todd*, 20 Tenn. App. 564, 570, 101 S.W.2d 486, 489 (1936).

construction of the will. *See Calhoun v. Campbell*, 763 S.W.2d at 749; 4 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills* § 30.27, at 169 (1961).[13]

Moreover, the law in effect when the testator dies controls all substantive rights in the estate, whether vested or inchoate. *See Marler v. Claunch*, 221 Tenn. 693, 698, 430 S.W.2d 452, 454 (Tenn. 1968). *See, e.g., Calhoun v. Campbell*, 763 S.W.2d 744 (holding that a new statute treating adopted children as descendants did not apply to the testator's will leaving property to "lineal descendants" of the remainderman under testator's will despite the fact that the remainderman died after the law was changed); *Williams v. Williams*, 79 Tenn. (11 Lea.) 652, 656 (1883) (holding that the Rule in Shelley's Case applied to a will where the testator died before a statute passed repealing the Rule); *In re Estate of Bass*, No. 02A01-9504-CH-00094, 1996 WL 325582 (Tenn. Ct. App. June 11, 1996) (No Tenn. R. App. P. 11 application filed) (holding that an amendment of a statute providing for a widow's support did not apply because it was enacted after the testator's death).

The Tennessee Supreme Court has already implicitly applied these principles in the context of the precursor to Tenn. Code Ann. § 66-1-106. The Court rendered decisions in *Mauk v. Irwin*, 175 Tenn. 443, 135 S.W.2d 922 (1940) and *Magevney v. Karsch*, 167 Tenn. 32, 65 S.W.2d 562 (1933) after the enactment of the 1932 Code. Nevertheless, the statute did not affect the outcome of either case because the wills under consideration were executed and probated before 1932. *See Redman v. Evans*, 184 Tenn. 404, 407-08, 199 S.W.2d 115, 116 (1947); *Leach v. Dick*, 205 Tenn. at 225, 326 S.W.2d at 440; *Mauk v. Irwin*, 175 Tenn. 443, 135 S.W.2d 922; *Magevney v. Karsch*, 167 Tenn. 32, 65 S.W.2d 562.

Mr. Crockett's will is the controlling instrument in this case. In his will, Mr. Crockett gave Ms. Crockett a life estate with unlimited powers of disposition in all of his property. The language of this will and its legal implications control whether Ms. Crockett's sale of the property defeated the interest of the remaindermen named in his will. Therefore, we must construe Mr. Crockett's will according to the law in existence in 1963 when Mr. Crockett died.

Because the post-1981 version of Tenn. Code Ann. § 66-1-106 does not affect our construction of Mr. Crockett's will, this case is controlled by the pre-1981 version of the statute as construed by *Hobbs v. Wilson*. In the will at issue in *Hobbs v. Wilson*, the testator gave his wife a life estate in certain property and then stated in his will as follows:

> having full confidence in [my wife's] judgment and discretion, I authorize her to use so much of the corpus thereof as she shall find necessary for her comfort and maintenance, she being the sole judge

---

[13]In most jurisdictions, if a will's language creates a certain estate when the will is executed, but the law later changes so that the same language would pass a different estate, the law in force when the will was made governs unless the language of the will makes it clear that the testator intended differently. *See* 4 William J. Bowe & Douglas H. Parker, *Page on the Law of Wills*, § 30.27 (1961). Tennessee does not appear to follow this rule.

> of her needs, . . . and at her death, whatever remains undisposed of,
> if any, I will and devise the same in fee simple to my twelve nieces
> and nephews as equal tenants in common . . . .

*Hobbs v. Wilson*, 614 S.W.2d at 329. The Supreme Court held that this clause created a life estate with an unlimited power of disposition. Consequently, pursuant to Tenn. Code Ann. § 66-1-106 as it then existed, the life tenant's sale of the property terminated the remainder interest, and the remaindermen had no interest in the property sold or in the proceeds of the sale. *See Hobbs v. Wilson*, 614 S.W.2d at 330-31.

Mr. Crockett's will gave Ms. Crockett a life estate in all of his real and personal property and provided as follows:

> [Ms. Crockett has the] power to sell, mortgage, use or consume such
> property, for her needs in her sole and absolute discretion. At the
> death of my said wife, I give, will, devise and bequeath all of the
> remainder of said property, both real and personal, which has not
> been disposed of by my said wife, to my sister, Mrs. Ruth Crockett
> Claiborne, and my mieces [sic] and nephews . . ..[14]

This language is similar in form to, and the same in substance as, that of the will at issue in *Hobbs v. Wilson.* The parties have agreed throughout this proceeding that the will gave Ms. Crockett a life estate with an unlimited power of disposition. Ms. Crockett sold the farm, and remaindermen do not argue on this appeal that Ms. Crockett did not also dispose of the personal property subject to the life estate. Under the version of Tenn. Code Ann. § 66-1-106 existing when Mr. Crockett died in 1963, Ms. Crockett's sale of the property terminated the remaindermen's interest in the Crockett farm and thus, the remaindermen's interest did not transfer to the proceeds of the sale of the farm.

## II.
### UNDUE INFLUENCE AND CAPACITY

The remaindermen assert that the trial court erred by failing to invalidate Ms. Crockett's conveyance of the farm to the Ingrams on the grounds that Ms. Rambo unduly influenced Ms. Crockett or that Ms. Crockett was incompetent at the time of the sale. After carefully reviewing the record, we have determined that the trial court did not err.

## A.
### MS. CROCKETT'S MENTAL CAPACITY TO CONVEY

---

[14]This closely follows a sample clause in a contemporary edition of a Tennessee treatise on the law of wills. *See* 2 Harry Phillips, *Pritchard on the Law of Wills and Administration of Estates* § 962 (3rd ed. 1955).

Both sides presented lay and expert testimony regarding Ms. Crockett's mental capacity to sell the Crockett farm in 1993. After hearing this conflicting testimony, the trial court found that Ms. Crockett was mentally competent to sell the farm. The remaindermen now assert that the evidence does not support the trial court's finding. We disagree.

A deed is valid only if it is the product of the grantor's conscious, voluntary act. Thus, a deed is void if, at the time of its execution, the grantor was mentally unbalanced, without intelligent comprehension of the act being performed, and incapable of transacting. *See Bright v. Bright*, 729 S.W.2d 106, 109 (Tenn. Ct. App. 1986); *Brown v. Weik*, 725 S.W.2d 938, 944 (Tenn. Ct. App. 1983); *Hinton v. Robinson*, 51 Tenn. App. 1, 9, 364 S.W.2d 97, 100 (1962). A party seeking to rescind a conveyance because of mental incapacity has the burden of proof. *See Williamson v. Upchurch*, 768 S.W.2d 265, 269 (Tenn. Ct. App. 1988).

Because the trial court heard this case without a jury, we review its findings of fact de novo upon the record with a presumption of correctness. Unless the evidence preponderates against the findings, we must affirm absent error of law. *See* Tenn. R. App. P. 13(d); *Campbell v. Florida Steel Corp.*, 919 S.W.2d 26, 35 (Tenn. 1996); *Knight v. Lancaster*, 988 S.W.2d 172, 174 (Tenn. Ct. App. 1998). The trial court is uniquely positioned to observe the manner and demeanor of witnesses, and so appellate courts accord particular deference to trial court findings that depend upon weighing the value or credibility of competing oral testimony. *See Long v. Tri-Con Indus., Ltd.*, 996 S.W.2d 173, 178 (Tenn. 1999); *Doe A v. Coffee County Bd. of Educ.*, 925 S.W.2d 534, 537 (Tenn. Ct. App. 1996); *St. Clair v. Evans*, 857 S.W.2d 49, 51 (Tenn. Ct. App. 1993).

Expert and lay witnesses gave conflicting accounts of Ms. Crockett's competence when she sold the Crockett farm in February 1993. Two expert witnesses testified. Dr. Tim Nash examined Ms. Crockett on January 26, 1993, and found her competent to manage her affairs, though mildly forgetful. Dr. Pamela Auble examined Ms. Crockett on January 26, 1994, almost a year after Ms. Crockett conveyed the Crockett farm. Dr. Auble testified that Ms. Crockett suffered from long-standing dementia and that people with dementia do not have lucid periods.

Several lay witnesses also testified regarding Ms. Crockett's competence. Three witnesses stated that Ms. Crockett was mentally competent when she sold the farm. Peggy Whitsett, the manager of the assisted living facility where Ms. Crockett lived from 1991 until her death, testified that Ms. Crockett was competent in 1993 when she sold the Crockett farm. Mr. Ingram, the co-purchaser of the Crockett farm, testified that a realtor questioned Ms. Crockett at length on the day of the sale and ascertained that Ms. Crockett understood she was selling the Crockett farm. John C. Leonard, Ms. Crockett's guardian ad litem who visited her several times during 1993 and 1994, testified that Ms. Crockett was old but not senile. At the same time, two other lay witnesses testified that Ms. Crockett was not competent. Alta Garrett, Mr. Crockett's sister, testified that Ms. Crockett was not competent when she sold the Crockett farm. Likewise, Louise Garrett, Mr. Crockett's niece who saw Ms. Crockett regularly until Ms. Crockett moved into the assisted living facility, testified that Ms. Crockett was not competent.

We are reluctant to use the paper record to second-guess the trial court's determination of the relative value of this conflicting testimony. We note, however, that two of the lay witnesses who testified that Ms. Crockett was competent have no obvious stake in the outcome of this litigation.[15] The evidence does not preponderate against the trial court's finding that Ms. Crockett was competent to sell the Crockett farm.

## B.
### UNDUE INFLUENCE BY MS. RAMBO

The remaindermen also assert that the sale of the Crockett farm should be set aside because Ms. Rambo exerted undue influence on Ms. Crockett's decision. The remaindermen have introduced sufficient evidence of a confidential relationship and other suspicious circumstances to shift the burden to Ms. Rambo to prove that the transaction was fair. We have determined that the evidence supports the trial court's determination that Ms. Rambo presented clear and convincing evidence that the sale of the Crockett farm was fair to Ms. Crockett.

While undue influence can be proved either by direct or circumstantial evidence, *see In re Depriest's Estate*, 733 S.W.2d 74, 78 (Tenn. Ct. App. 1986) (direct evidence); *Patton v. Allison*, 26 Tenn. (7 Humph.) 320, 333 (1846) (circumstantial evidence), direct evidence is rarely available. *Hager v. Hager*, 17 Tenn. App. 143, 161, 66 S.W.2d 250, 260 (1933). Thus, in most cases, those attacking a conveyance or will on the grounds of undue influence must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently. *See Taliaferro v. Green*, 622 S.W.2d 829, 835-36 (Tenn. Ct. App. 1981), *overruled on other grounds* by *Matlock v. Simpson*, 902 S.W.2d 384, 386 (Tenn. 1995).

The suspicious circumstances most frequently relied upon to establish undue influence are: (1) the existence of a confidential relationship between the testator and the beneficiary; (2) the testator's physical or mental deterioration; (3) the beneficiary's active involvement in procuring the will or conveyance. *See In re Elam's Estate*, 738 S.W.2d 169, 173 (Tenn. 1987); *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Taliaferro v. Green*, 622 S.W.2d at 835-36.

The existence of a confidential relationship, such as an unrestricted power of attorney, combined with a transaction benefitting the dominant party, creates a presumption of undue influence. *See Matlock v. Simpson*, 902 S.W.2d at 386; *Johnson v. Craycraft*, 914 S.W.2d 506, 510 (Tenn. Ct. App. 1995); *Petty v. Privette*, 818 S.W.2d 743, 747 (Tenn. Ct. App. 1989). The presumption of undue influence is rebuttable by clear and convincing evidence of the fairness of the transaction. *See Matlock v. Simpson*, 902 S.W.2d at 386; *Hager v. Fitzgerald*, 934 S.W.2d 668, 671 (Tenn. Ct. App. 1996); *Bills v. Lindsay*, 909 S.W.2d 434, 440-41 (Tenn. Ct. App. 1993).

---

[15]Presumably, Mr. Ingram would prefer not to see the conveyance of the Crockett farm set aside.

Although proving that the subservient party had independent advice is one way of showing the fairness of the transaction, *see Matlock v. Simpson*, 902 S.W.2d at 386; *Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977), it is not the only way. *See Williamson v. Upchurch*, 768 S.W.2d at 270-71; *Killian v. Campbell*, 760 S.W.2d 218, 221 (Tenn. Ct. App. 1988). Courts require evidence of independent advice only where it would be difficult to show the fairness of the transaction without it. *See Depriest's Estate*, 733 S.W.2d at 79. This typically arises when the transaction under scrutiny is a gift from a feeble or incompetent subservient party to the dominant party, and the gift leaves the donor impoverished. *See Richmond v. Christian*, 555 S.W.2d at 108; *Walsh v. Brown*, 703 S.W.2d 158, 163 (Tenn. Ct. App. 1985); *Simmons v. Foster*, 622 S.W.2d 838, 840-41 (Tenn. Ct. App. 1981).

Ms. Rambo was Ms. Crockett's attorney-in-fact and the primary residual beneficiary under her will. Ms. Rambo stood to gain from Ms. Crockett's decision to sell the Crockett farm because the sale defeated the interest of the remaindermen in the property, thereby increasing the size of Ms. Crockett's estate. Any increases in the size of Ms. Crockett's estate thus increased the size of Ms. Rambo's share of the estate. Accordingly, a presumption arises that Ms. Rambo unduly influenced Ms. Crockett to sell the Crockett farm. To rebut this presumption, Ms. Rambo had to present clear and convincing evidence of the fairness of the transaction. Nevertheless, because the sale of the Crockett farm was a gift to Ms. Rambo only in the loosest sense, and certainly did not leave Ms. Crockett impoverished, it is not necessary to show that Ms. Crockett received independent advice.

From the evidence in the record, we find that Ms. Rambo has met her burden of proving by clear and convincing evidence that the transaction was fair to Ms. Crockett[16] and that the decision to sell the farm was Ms. Crockett's free and unconstrained choice. The Ingrams initiated contact with Ms. Rambo to make an offer on the Crockett farm because it was adjacent to their own, not because of any association with Ms. Rambo. At first, Ms. Rambo told the Ingrams that the Crockett farm was not for sale, and only informed Ms. Crockett of the offer after the Ingrams made their second or third overture. Ms. Crockett, rather than Ms. Rambo, signed the contract and the deed. At closing, the real estate agent questioned Ms. Crockett to ensure that she understood what she was doing, and was satisfied that she did. Moreover, the purchase price was within a reasonable negotiating range even according to the testimony of the remaindermen's expert appraiser.[17] Finally, and perhaps most importantly, Ms. Crockett's decision to sell to the Ingrams made perfect sense. She lived in a retirement home, and her poor health precluded her from ever living on the Crockett farm again. Selling the Crockett farm would avoid waste and ensure that she had adequate funds to continue to support herself in the future.

---

[16]Of course, for the purposes of this discussion, it is irrelevant whether the transaction was "fair" to the remaindermen.

[17]The Ingrams paid $311,292 for the Crockett farm. James Donald Turner, an appraiser for the remaindermen, valued the Crockett farm at $378,000. However, he admitted that he only drove by the farm and that the price received was within a reasonable negotiating realm in view of the fact that no real estate agent was involved, and that the home was deteriorating.

The remaindermen request us to use this case as a vehicle for recognizing the tort of intentional interference with inheritance or gift and to find that Ms. Rambo committed this tort by depriving them of their remainder interest. We affirm the trial court's finding that the facts of this case do not satisfy the elements of the tort of intentional interference with inheritance or gift and, accordingly, decline to determine whether Tennessee should recognize this cause of action.

The Restatement (Second) of Torts defines intentional interference with inheritance or gift as follows: "[o]ne who by fraud, duress or other tortious means intentionally prevents another from receiving from a third person an inheritance or gift that he would otherwise have received is subject to liability to the other for loss of the inheritance or gift." Restatement (Second) of Torts § 774B (1977). In light of the decisions in jurisdictions adopting this tort, a plaintiff seeking to recover damages for intentionally preventing another from receiving an inheritance must prove (1) that he or she has a legitimate expectation of receiving the inheritance; (2) that the defendant intentionally interfered with that expectancy; (3) that the interference involved "tortious" conduct, such as fraud, duress, or undue influence; (4) that it is reasonably certain that, but for the defendant's interference, the plaintiff would have realized the expectancy; and (5) that the defendant's interference caused damage to the plaintiff. *See, e.g., Nemeth v. Banhalmi*, 425 N.E.2d 1187, 1191 (Ill. App. Ct. 1981); *Morrill v. Morrill*, 712 A.2d 1039, 1042 (Me. 1998); *Geduldig v. Posner*, 743 A.2d 247, 255 (Md. Ct. Spec. App. 1999); *Doughty v. Morris*, 871 P.2d 380, 384 (N.M. Ct. App. 1994); *Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993); *Harris v. Kritzik*, 480 N.W.2d 514, 517 (Wis. Ct. App. 1992).[18]

So far, at least eleven jurisdictions have expressly adopted the tort of intentional interference with inheritance or gift.[19] Five jurisdictions appear to have implicitly adopted the tort, or expressly

---

[18]Although the Restatement and all of these cases require interference with inheritance or gift through independently "tortious" conduct, Restatement (Second) of Torts § 774B cmt. c, the same cases list undue influence as an example of the requisite conduct. Because undue influence is not a tort, it may be more helpful to refer to this requirement as interference through independently *wrongful* conduct.

[19]*See Davison v. Feuerherd*, 391 So.2d 799, 799 (Fla. Dist. Ct. App. 1980); *Allen v. Leybourne*, 190 So.2d 825, 828-29 (Fla. Dist. Ct. App. 1966); *In re Estate of Roeseler*, 679 N.E.2d 393, 406 (Ill. App. Ct. 1997); *Nemeth v. Banhalmi*, 425 N.E.2d at 1190-91; *Minton v. Sackett*, 671 N.E.2d 160, 162 (Ind. Ct. App. 1996); *Huffey v. Lea*, 491 N.W.2d 518, 520 (Iowa 1992); *Frohwein v. Haesemeyer*, 264 N.W.2d 792, 795 (Iowa 1978); *Morrill v. Morrill*, 712 A.2d at 1041-42; *Cyr v. Cote*, 396 A.2d 1013, 1018 (Me. 1979); *Graham v. Manche*, 974 S.W.2d 580, 583 (Mo. Ct. App. 1998); *Hammons v. Eisert*, 745 S.W.2d 253, 257-58 (Mo. Ct. App. 1988); *Doughty v. Morris*, 871 P.2d 383; *Firestone v. Galbreath*, 616 N.E.2d 202, 203 (Ohio 1993); *Brandes v. Rice Trust, Inc.*, 966 S.W.2d 144, 146 (Tex. App. 1998); *King v. Acker*, 725 S.W.2d 750, 754 (Tex. App. 1987); *Kessel v. Leavitt*, 511 S.E.2d 720, 763 (W. Va. 1998); *Barone v. Barone*, 294 S.E.2d 260, 264 (W. Va.

(continued...)

adopted a version of it.[20]   In most of the remaining jurisdictions, courts have not decided whether to adopt the tort for one of three reasons: (1)  the issue has not yet arisen; (2) the facts presented did not support a cause of action for interference with inheritance or gift;[21] or (3) existing law already provided the plaintiff with an adequate remedy.[22]

---

[19](...continued)
1982); *Harris v. Kritzik*, 480 N.W.2d at 517.

[20]*See Mitchell v. Langley,* 85 S.E. 1050, 1051 (Ga. 1915) (holding that a cause of action existed when a defendant fraudulently induced the deceased during his lifetime to remove plaintiffs as beneficiaries of a benefit certificate payable at death) *cited in Morgan v. Morgan*, 347 S.E.2d 595, 596 (Ga. 1986); *Labonte v. Giordano*, 687 N.E.2d 1253, 1254-56 (Mass. 1997) (holding that an action for tortious interference with expectancy of receiving a legacy cannot be maintained until after death of testatrix but, because testatrix had died during pendency of appeal, remanding to permit plaintiff to amend complaint); *Monach v. Koslowski*, 78 N.E.2d 4, 6 (Mass. 1948) (recognizing that prior Massachusetts case law implies that a tort action exists for wrongful interference with a devise, legacy or gift); *Griffin v. Baucom*, 328 S.E.2d 38, 41-42 (N.C. Ct. App. 1985) (holding that although only the statutory remedy of a will contest is available when a will is submitted for probate, if no will is submitted, an action for tortious interference with inheritance is permitted); *Allen v. Hall*, 974 P.2d 199, 202 (Or. 1999) (refusing to reach the question of whether Oregon recognizes the tort of intentional interference with inheritance because, under Oregon law, such interference "may be actionable under a reasonable extension of the well-established tort known as intentional interference with economic relations.").

[21]*See, e.g., Holt v. First Nat'l Bank of Mobile*, 418 So.2d 77, 80 (Ala. 1982) (holding that the plaintiffs had not alleged facts bringing them within the proposed cause of action); *Dunham v. Dunham*, 528 A.2d 1123, 1130-31 (Conn. 1987) (affirming trial court's decision to recast claims for breach of fiduciary duty and tortious interference with inheritance as legal malpractice claim); *Troy v. Folger*, No. CV 970161947S, 1998 WL 252355, at *2 (Conn. Super. Ct. May 8, 1998) (mem.) (refusing to reach the issue of "interference with prospective advantage" in inheritance context because not adequately briefed); *Casternovia v. Casternovia*, 197 A.2d 406, 409 (N.J. Super. Ct. App. Div. 1964) (holding that action for interference with inheritance or gift could not be maintained because potential donor was alive and competent); *Douglass ex rel. Louthian v. Boyce*, 519 S.E.2d 802, 807 (S.C. Ct. App. 1999) (noting that South Carolina has never recognized claims for interference with inheritance rights and, on the facts presented, such a claim could not succeed in any event).

[22]*See, e.g., Axe v. Wilson*, 96 P.2d 880, 885-88 (Kan. 1939) (in action for malicious interference with right of inheritance through fraud and undue influence that did not seek damages beyond what the plaintiff would receive in a successful will contest, held that plaintiff's remedy lay in then pending action to contest the will); *Geduldig v. Posner*, 743 A.2d at 257 (declining to recognize tortious interference with inheritance where it was "duplicative of the independent claims based on fraud and undue influence, except for the damage claim [emotional distress, harm to reputation, and punitive damages] that would constitute an expansion of existing law"); *Hauck v.*
(continued...)

We decline to use this case to determine whether Tennessee should adopt the tort of interference with inheritance or gift. On the facts presented, two key elements of the tort are missing. First, Ms. Rambo engaged in no independently wrongful conduct that caused Ms. Crockett to terminate the interest of the remaindermen. As we have already determined, Ms. Rambo did not unduly influence Ms. Crockett to sell the Crockett farm. Second, the record contains no evidence that Ms. Rambo intentionally interfered with the remaindermen's inheritance. There is no indication that Ms. Rambo knew of the pertinent provisions in Mr. Crockett's will or of their legal ramifications. Even if Ms. Rambo saw or heard about the provision and consulted counsel, it would be difficult to predict the sequence of events that subsequently unfolded, culminating in this court's reversal of the trial court's holding regarding whether the 1932 or the 1981 version of Tenn. Code Ann. § 66-1-106 would apply. Without such far-sighted legal expertise, Ms. Rambo could not have known that the sale of the Crockett farm would defeat the remaindermen's interest in the farm itself or in the proceeds of the farm's sale.

## IV.
### THE FEE AWARD TO THE REMAINDERMEN'S FORMER LAWYER

The remaindermen take issue with the trial court's decision to award their former lawyer $8,750 for the services he provided before they discharged him. They assert that the lawyer contracted for and attempted to collect a clearly excessive fee in violation of Tenn. S. Ct. R. 8, DR 2-106(A) and therefore that the lawyer is not entitled to any fee. We concur with the trial court's conclusion that the remaindermen's former lawyer is entitled to a quantum meruit recovery for the value of the services he provided before the remaindermen discharged him.

### A.

At the outset of this case, Messes. Fell and Bowland[23] retained John Reynolds and Kevin S. Key to represent them. On June 4, 1994, Mr. Key sent Messes. Fell and Bowland an engagement letter confirming the fee arrangement. According to the engagement letter, the lawyers were to first research the language of Mr. Crockett's will for a fee of not less than $750, nor more than $1,500. If the case went to litigation, Messes. Fell and Bowland agreed to pay "an additional fee of $10,000, plus one-third (⅓) of all sums recovered." The $10,000 "minimum fee for litigation" was payable in two installments of $5,000 each, and the initial research fee would be credited to the $10,000 fee. Finally, despite its earlier statement suggesting the contrary, the letter specified that the $10,000 fee would be credited to any contingency fee.

---

[22](...continued)
*Seright*, 964 P.2d 749, 753 (Mont. 1998) (refusing to address whether Montana recognizes tortious interference with inheritance as a cause of action because the evidence did not support such a claim in one instance and, in the others, the plaintiff failed to show how the new tort would produce a different result than existing law on undue influence).

[23]Ms. Little and Ms. Kirkham Bowers did not intervene a plaintiffs until April 1998.

Messes. Fell and Bowland accepted these terms and paid Messrs. Reynolds and Key the first $5,000 installment on the $10,000 minimum fee. Messrs. Reynolds and Key each received $2,500 of this installment. For over a year, Messrs. Reynolds and Key together represented Messes. Fell and Bowland. Among other things, Mr. Reynolds researched and drafted the complaint and summons, prepared interrogatories and requests for production of documents, drafted a motion to compel a response to interrogatories, reviewed the response to interrogatories and requests for production of documents, and researched and drafted a response to Ms. Rambo's motion for summary judgment. Mr. Reynold's response to Ms. Rambo's motion for summary judgment was successful. On July 28, 1995, the trial court entered a memorandum opinion denying the motion, and expressing its belief that the remaindermen named in Mr. Crockett's will are entitled to the net proceeds of the sale of the Crockett farm.

Just over a month after the trial court ruled in their favor, Messes. Fell and Bowland wrote to Mr. Reynolds terminating his services and seeking an "unconditional release from our prior contingency agreement." Messes. Fell and Bowland also requested an accounting of Mr. Reynolds's time to enable them to pay him on an hourly basis.[24] Mr. Reynolds responded with a letter in which he refused to release Messes. Fell and Bowland from the contingency agreement but agreed to prepare, at his convenience, a statement of his time and services.

On September 21, 1995, Mr. Reynolds filed a notice of attorney's lien. In July, 1998, the trial court heard Mr. Reynolds's motion to set attorney's fees. At that time, Mr. Reynolds submitted an affidavit concerning his fees, copies of the documents he researched, drafted or reviewed, and a list of the work he performed. Mr. Reynolds also testified that he had not maintained contemporaneous time records because the engagement letter provided that he would be paid on a contingency basis. Nevertheless, he estimated that he spent between seventy-five and one hundred hours on the case. Mr. Reynolds also testified that his normal rate was $150 per hour and that he considered this to be the average rate in Nashville at the time.

The trial court ruled from the bench that "this is not an appropriate case for a contingency fee." The court did not find, however, that the contingency fee arrangement was clearly excessive in violation of ethical standards. Instead, the trial court determined that Mr. Reynolds was entitled to payment for his services on a quantum meruit basis. The court accepted Mr. Reynolds's more conservative estimate of his time, seventy-five hours, and awarded him $8,750 in legal fees.[25]

**B.**

The relationship between a client and a lawyer is essentially contractual. *See Alexander v. Inman*, 974 S.W.2d 689, 694 (Tenn. 1998); *In re Ellis*, 822 S.W.2d 602, 607 (Tenn. Ct. App. 1991).

_____

[24]Mr. Key continued to represent Messes. Fell and Bowland, but at an hourly rate rather than on a contingency basis.

[25]The $8,750 fee is the product of the minimum number of hours Mr. Reynolds estimated he worked (75) and his normal fee per hour ($150) minus the $2,500 that Mr. Reynolds had already received.

In its most basic terms, this contract involves the exchange of competent legal services in return for an agreement to pay a reasonable fee. The lawyer is obligated to exercise the utmost good faith in the discharge of his or her duties to represent the client. *See Crawford v. Logan*, 656 S.W.2d 360, 364 (Tenn. 1983); *Fitch v. Midland Bank & Trust Co.*, 737 S.W.2d 785, 789 (Tenn. Ct. App. 1987). A lawyer who discharges his or her duties appropriately is entitled to the reasonable, agreed-upon compensation without regard to the actual benefit the services might have been to the client. *See Spofford v. Rose*, 145 Tenn. 583, 611, 237 S.W. 68, 76 (1922); *Bills v. Polk*, 72 Tenn. 494, 496 (1880); *Adams v. Mellen*, 618 S.W.2d 485, 488 (Tenn. Ct. App. 1981).

The courts may decline to enforce an attorney's fee contract only (1) when the lawyer did not negotiate the contract in good faith, *see Alexander v. Inman*, 974 S.W.2d at 693-94; (2) when the contract contains a provision repugnant to public policy, such as an unreasonable fee agreement, *see White v. McBride*, 937 S.W.2d 796, 800-03 (Tenn. 1996); or (3) when the lawyer has otherwise breached his or her fiduciary obligations to the client, and this breach has prejudiced the client's interests. *See Crawford v. Logan*, 656 S.W.2d at 365; *Alexander v. Inman*, 903 S.W.2d 686, 694 (Tenn. Ct. App. 1995); *Coleman v. Moody*, 52 Tenn. App. 138, 155, 372 S.W.2d 306, 311-314 (1963).

If a fee contract is unenforceable because of an innocent drafting error, the courts may award the lawyer a quantum meruit recovery. *See White v. McBride*, 937 S.W.2d at 803. If, however, a lawyer violates Tenn. S. Ct. R. 8, DR 2-106(A) by contracting for, charging, or attempting to collect a clearly excessive fee, the lawyer may not collect any fee – even a fee that would be reasonable for the work actually performed. *See Swafford v. Harris*, 967 S.W.2d 319, 324 (Tenn. 1998); *White v. McBride*, 937 S.W.2d at 803. A fee is clearly excessive if, "after a review of the facts, a lawyer of ordinary prudence would be left with a definite and firm conviction that the fee is in excess of a reasonable fee." Tenn. S. Ct. R. 8, DR 2-106(B); *In re Davis's Estate*, 719 S.W.2d 526, 528 (Tenn. Ct. App. 1986).

Tenn. S. Ct. R. 8, DR 2-106(B) lists eight factors for determining the reasonableness of a lawyer's fee. The appellate courts have consistently applied these factors when asked to review a trial court's fee award. *See Connors v. Connors*, 594 S.W.2d 672, 676-77 (Tenn. 1980); *Alexander v. Inman*, 903 S.W.2d at 695. The reasonableness of a requested fee depends on the facts of each case. *See Alexander v. Inman*, 903 S.W.2d at 695; *Hail v. Nashville Trust Co.*, 31 Tenn. App. 39, 51, 212 S.W.2d 51, 56 (1948). Accordingly, appellate courts review a trial court's decision regarding attorney's fees using the abuse of discretion standard. *See McCarty v. McCarty*, 863 S.W.2d 716, 722 (Tenn. Ct. App.1992).

The *White v. McBride* decision, relied on so heavily by the remaindermen, is only superficially similar to the case at bar. That case involved a one-third contingency fee agreement, but the similarities between that case and the present one end there. The lawyer in *White v. McBride* undertook to represent the husband of the deceased in an uncontested probate proceedings in which there was never a doubt that the husband would recover one-third of the estate.[26] *See White v.*

[26]The husband was entitled to $349,000. The attorney's fee would have been one-third of
(continued...)

*McBride*, 937 S.W.2d at 799. In contrast, when Messrs. Reynolds and Key agreed to represent Messes. Fell and Bowland on a contingency basis, they faced a vigorously contested case involving extensive discovery, a novel question of law, and a very real possibility that Messes. Fell and Bowland would not recover at all. In *White v. McBride*, the trial court found the contingency fee arrangement was clearly excessive; however in this case, the trial court implicitly found that the fee contract was not clearly excessive because it determined that Mr. Reynolds was entitled to a quantum meruit fee award.

The fee awarded by the trial court reflects a conservative estimate of the time Mr. Reynolds spent on behalf of Messes. Fell and Bowland. Mr. Reynolds represented Messes. Fell and Bowland for over a year in this matter. Although he did not keep detailed records of his time, Mr. Reynolds provided the trial court with a detailed list of the tasks he performed and copies of the documents he researched, drafted, and reviewed. In unrefuted testimony, Mr. Reynolds estimated that he spent seventy-five to one hundred hours on the case and that his normal fee was $150 per hour. The trial court erred on the side of caution by choosing seventy-five hours, Mr. Reynolds' lowest estimate of his billable time, and credited Messes. Fell and Bowland with the $2,500 they had already paid Mr. Reynolds. We have independently reviewed Mr. Reynolds's request for fees in light of the factors contained in Tenn. S. Ct. R. 8, DR 2-106(B) and find no basis to second-guess the trial court's decision. Accordingly, we affirm the trial court's decision to award Mr. Reynolds $8,750 in legal fees.

## V.
### THE REMOVAL OF MS. RAMBO AS EXECUTRIX

As a final matter, the remaindermen assert that the trial court erred by failing to replace Ms. Rambo as executrix and by failing to require Ms. Rambo to provide a more complete accounting of the estate. They also assert that the trial court should have required Ms. Rambo to provide a more complete accounting of interest on the certificates of deposit that the trial court had awarded them. Because our determination that the remaindermen do not have an interest in the proceeds from the sale of the Crockett farm affects all of these issues, we will deal with them together.

The remaindermen are not beneficiaries under Ms. Crockett's will and do not stand to inherit from Ms. Crockett if she were intestate. Their only standing to maintain this action derives from their claimed interest in the farm or in the proceeds from its sale. We have determined that the sale of the farm terminated the remainder interest of the remaindermen. Accordingly, the remaindermen no longer have an interest in Ms. Crockett's estate. Accordingly, they have no standing to challenge Ms. Rambo as executrix of Ms. Crockett's estate or to demand an accounting of the estate's assets.[27]

---

[26](...continued)
this amount. See *White v. McBride*, 937 S.W.2d at 799.

[27]It is worth mentioning, though, that the trial court appointed an administrator ad litem, ordered an accounting, gave the remaindermen access to estate records and accounts and to the personal bank account records of Ms. Rambo, and specifically found that Ms. Rambo did not

(continued...)

-18-

In addition, our reversal of the trial court's $269,420.89 to the remaindermen renders moot any issue regarding how much interest on that award the remaindermen should receive.

## VI.

We reverse the portion of the judgment awarding $269,420.89 to Madge Kirkham Fell, Betty Kirkham Bowland, Debbie Little, and Bernice Kirkham Bowers and affirm the remaining portions of the judgment. We remand the case to the trial court for further proceedings regarding the remaindermen's Tenn. R. Civ. P. 60.02 motion and any other appropriate matter. We also tax the costs of this appeal to Madge Kirkham Fell, Betty Kirkham Bowland, Debbie Little, and Bernice Kirkham Bowers and their surety for which execution, if necessary, may issue.

---

[27](...continued)
misappropriate any of the estate's funds.