# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### October 13, 2011 Session

## IN RE: THE ESTATE OF BESSIE LOUISE THORNTON

### Appeal from the Chancery Court for Wilson County
### No. 09183    Charles K. Smith, Chancellor

---

### No. M2011-01287-COA-R3-CV - Filed January 12, 2012

---

In this will contest, the jury found that a confidential relationship existed between the principal beneficiary of the will and the testatrix; however, the jury also found that the will was not the result of undue influence and, therefore, the will was valid. The contestant filed post-trial motions pursuant to Rules 50.02 and 59 of the Tennessee Rules of Civil Procedure, seeking to set aside the judgment notwithstanding the jury verdict, and alternatively, for a new trial. The trial court set aside the judgment of the jury, and entered judgment declaring the will invalid on the grounds that it was the result of undue influence. The trial court did not expressly rule on the alternative motion for a new trial. The proponent of the will appeals, contending the trial court erred in setting aside the jury's verdict and entering judgment in favor of the contestant. We agree that the trial court erred by entering a judgment notwithstanding the verdict; however, we have also concluded that the trial court, acting in its role as thirteenth juror, implicitly and conditionally granted the contestant's motion for a new trial. Accordingly, we remand the case for a new trial.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court
### Reversed and Remanded

FRANK G. CLEMENT, JR., J., delivered the opinion of the Court, in which PATRICIA J. COTTRELL, P.J., M.S., and ANDY D. BENNETT, J., joined.

Robert Evans Lee, Lebanon, Tennessee; Stephanie Smartt Heckman, Mt. Juliet, Tennessee; and John D. Kitch, Nashville, Tennessee, for the appellant, Nan Kimbro.

Jack O. Bellar and Jamie D. Winkler, Carthage, Tennessee, for the appellee, Clinton O. Thornton, Jr.

**OPINION**

This is a classic will contest brought by the decedent's only child. The decedent, Bessie Thornton, died on April 14, 2009, at the age of 89. The Last Will and Testament, dated January 15, 2002, bequeathed and devised all of the decedent's estate to her next door neighbor, Nan Kimbro, with the exception of a 1987 Mazda automobile, which was bequeathed to the decedent's niece. The decedent's son, Clinton Thornton, Jr., was explicitly excluded from the will.

Ms. Kimbro, who was nominated to be the executrix, filed a petition to admit the January 15, 2002 will to probate in common form. The will was admitted to probate on April 24, 2009, and letters testamentary were issued to Ms. Kimbro.

Shortly thereafter, the decedent's son filed a Complaint to Contest the Will, alleging that his mother was incompetent and lacked testamentary capacity at the time of the execution of the will, that Ms. Kimbro held a confidential relationship with his mother, and that the will was the result of undue influence by Ms. Kimbro.

A jury trial was held, revealing the following: The decedent lived on a one-acre plot of land at 5371 Alvin Sperry Road, Mount Juliet, Tennessee for over thirty years. She retired as an LPN nurse from the Metro Nashville Public Health Department. Her husband, Clinton Thornton, Sr., passed away in the 1980s, and her son, Clinton Thornton, Jr. ("Mr. Thornton"), lived with her on the property until about 1977, when he was 19 years old. He lived with her off and on from 2000 until her death in 2009. The decedent's home was modest, heated with a wood stove. The decedent cared for several dogs over the years, including her own as well as strays she found on her property. Several members of the decedent's family lived nearby, including a niece, Martha Girgin, who lived in a trailer on the decedent's property. The decedent was close to her family, and they often gathered at the decedent's home for birthdays and holidays.

Ms. Kimbro and her husband purchased a neighboring 26-acre plot of land in 1991, built a house, and moved onto the property in 1995. Mr. and Mrs. Kimbro observed the decedent was an elderly woman, and occasionally brought her firewood. Ms. Kimbro and the decedent became friends in 1998, after Ms. Kimbro rescued several puppies that had been abandoned by the decedent's dog in a nearby woods. Ms. Kimbro found homes for the puppies, and helped the decedent have all her dogs spayed or neutered. Ms. Kimbro, who was also a registered nurse, began visiting with the decedent, taking her to hair appointments, and assisting the decedent in caring for the neighborhood stray dogs.

In 2001, the decedent was hospitalized following a stroke. By this time, the decedent's son, Mr. Thornton, had moved back onto the decedent's property. While the decedent was hospitalized, Mr. Thornton evidently attempted to do some remodeling on the decent's home. When she returned from the hospital, the decedent found that most of her possessions had been removed from her home, and became very upset at Mr. Thornton. Mr. Thornton moved out shortly thereafter, and the decedent grew closer to Ms. Kimbro. Although the decedent recovered from the stroke, she began driving less, became more physically feeble, and began taking daily doses of pain medicine. Ms. Kimbro began taking the decedent to doctor's appointments, retrieving her mail, paying her bills, and she continued bringing her firewood and taking her to hair appointments. She also helped the decedent install a new wood stove and chimney, and provided care for the decedent's dogs. Eventually, she opened a checking account as well as a Post Office box for the decedent. Ms. Kimbro also helped the decedent purchase a used Mazda automobile from Ms. Kimbro's parents.

In January 2002, Ms. Kimbro made an appointment for the decedent to meet with attorney Robert Callis to prepare her will. The decedent had no prior relationship with Mr. Callis; Ms. Kimbro chose Mr. Callis because he prepared Ms. Kimbro's will in 1998. Ms. Kimbro attended the first appointment with the decedent on January 7, 2002. The decedent returned to Mr. Callis's office one week later, on January 15, 2002, to sign and execute the will. Ms. Kimbro did not accompany the decedent for this second appointment when the will was executed; however, Ms. Kimbro paid the bill for Mr. Callis's services. Mr. Callis and Fontelle Sutherland, Mr. Callis's mother-in-law, witnessed the will. The will provided that one of the decedent's nieces, Mary Seaborn, would receive the decedent's Mazda automobile, and that the remainder of the decedent's estate, namely her property on Alvin Sperry Road, would go to Ms. Kimbro. The will also provided that Ms. Kimbro would care for the decedent's dogs.

Following its execution, Ms. Kimbro stored the decedent's will in Ms. Kimbro's safe deposit box where the will remained until the decedent's death. The decedent did not have her own key to Ms. Kimbro's safe deposit box and the decedent's family did not know of the 2002 will until it was probated in 2009. From 2002-2009, Ms. Kimbro continued to take the decedent to hair and medical appointments, pay her bills, and care for her dogs.

The evidence presented at trial further established that, after the decedent's will was admitted to probate in April of 2009, Ms. Kimbro wrote a letter to Mr. Thornton, who had moved back into the decedent's home, and Martha Girgin, who resided in a trailer on the decedent's property, notifying them that they would have to vacate the property.

In the proponent's case-in-chief, Ms. Kimbro presented, *inter alia*, the testimony of Attorney Robert Callis to establish the due execution of the January 22, 2002 will. Attorney

Callis testified that the decedent appeared to understand the will and her estate. He further stated that he was satisfied there was no undue influence. He also testified that he asked the decedent why she wanted to exclude her son from the will, and that the decedent explained that she had a history of problems with Mr. Thornton. He stated the decedent told him she wanted Ms. Kimbro to receive her estate because Ms. Kimbro cared for her and her dogs for several years. Ms. Kimbro also presented the testimony of the decedent's hairdresser, Sheila Keaton, who stated that she had long conversations with the decedent, and although the decedent was becoming physically feeble, she was "coherent about everything." Ms. Keaton testified that Ms. Kimbro always came to the beauty shop with the decedent and that they were friends.

Several of the decedent's family members testified the decedent was very close with her family, and consistently stated her intentions to leave her property to her son. They testified that her health, mentally and physically, had been in a state of decline since her stroke in 2001. They also testified that Ms. Kimbro was domineering and controlling of the decedent, and appeared to dislike the decedent's entire family. Mr. Thornton testified that the decedent hung a note beside her bed to let people know she did not want Ms. Kimbro in her house. Mr. Thornton also testified that Ms. Kimbro had attempted to purchase the decedent's property in the past, but the decedent wanted to keep the property in her family.

At the conclusion of the trial, the jury returned a verdict in favor of Ms. Kimbro, finding, pursuant to the Verdict Form, that "the decedent Bessie L. Thornton possessed the requisite testamentary capacity to make a valid Will on January 15, 2002"; "Nan Kimbro held a confidential relationship with the decedent, Bessie Louise Thornton"; and "the Will dated January 15, 2002, was not the result of undue influence." As a result of the verdict, the trial court entered judgment declaring the writing bearing the date of January 15, 2002, signed by the decedent Bessie Louise Thornton be admitted to probate as "the true, whole and Last Will and Testament of the said Bessie Louise Thornton . . . ."

After entry of the judgment, the contestant, Clinton Thornton, timely filed a Motion to Set Aside the Verdict; Enter a Judgment Notwithstanding the Verdict, Alter or Amend the Judgment, or for a New Trial, pursuant to Rule 50.02 and Rule 59 of the Tennessee Rules of Civil Procedure. Ms. Kimbro filed a response in opposition to the motions. Following a hearing, the trial court stated from the bench its factual findings and conclusions of law:

> THE COURT: All right. I've read the briefs and I have studied these cases, particularly the Kelley case and then the Sumner County case of Paulene Maddox and the Matlock case as well. I'm of the opinion that there was a confidential relationship. The jury found there was [a] confidential relationship. And when I look at all the evidence that was entered in this case,

-4-

the decedent became very dependent upon the defendant here, Ms. Kimbro. And then the law – all these cases state the law is a confidential relationship alone is not sufficient to create an undue influence that would be sufficient to set aside a will of a person.

In addition to there being a confidential relationship, there must be – the plaintiff must prove suspicious circumstances. It gave a list of several suggest[ions] in these different cases. But the ones in this case that, and I'm not saying this is a complete list, but the ones I've noticed was advanced age and deteriorating mental and physical health. She had a stroke. Some say it was small, pancreatitis and for some reason she was taking pain medication.

Unnatural, distribution of the property in the will it's kind of – it's unnatural to disinherit a son and leave everything to a neighbor. And the neighbor was certainly controlling of her. Took her places, was quite dependent on her, this Nan Kimbro is the neighbor and kept her mail and bills at her home.

The other suspicious circumstances were the fact that Nan Kimbro inherited everything and Nan Kimbro took Bessie Thornton, the decedent to a lawyer, this lawyer she had used in the past. And furthermore, Nan Kimbro paid the lawyer bill.

The terms of the will were kept secret. Nan Kimbro kept the will in her lock box. The proof at the trial was that Bessie Thornton, the decedent told people after execution of the will her intended disposition after she had died was inconsistent with the terms of the will. And mainly I remember, she wanted her niece and relatives, whoever, may be her sister, but at least her niece to remain on the property for the rest of her life or as long as she wanted to in apparently some tenant house that was on the property and there might be others.

. . . .

But I think cases have held, once you've established a confidential relationship and proved suspicious circumstances, certain suspicious, one or more, then there is a rebuttable presumption that the will was created or drafted or cured by undue influence and that this undue influence can only be, this rebuttable presumption can only be overcome by clear and convincing evidence.

-5-

As I've stated here, the only evidence that I can see that the defendant, Ms. Kimbro, introduced [was] . . . this one attorney for independent advice. I do think this attorney was competent. I don't find he did anything improper. I do question anyone's ability to remember what happened seven years ago, anyone in the world, I question anybody's ability. I don't particularly have a variety of will cases and so forth, but maybe he has that distinct ability to do that. But I would – I would doubt that. But that's not – that doesn't come into play here.

What comes into play is that there was a confidential relationship, suspicious circumstances gave rise to this will being created by undue influence. And as these cases have dealt, just a mere independent advice of attorney is not sufficient alone to set aside this presumption.

So based upon the case law, state of law the way it exists in the state of Tennessee at this time, I'm going to set aside the judgment of the jury and enter an order notwithstanding the verdict that the will was invalid and further set aside the probate of the will. That's the finding of this Court and the order to be entered. Thank you.

An order that was approved for entry by counsel for all parties was submitted to and approved by the trial judge; it reads as follows:

ORDER

This case came on to be heard before the Honorable C. K. Smith, Chancellor for the Chancery Court for Wilson County, Tennessee, upon the Motion to Set Aside the Verdict and Enter a Judgment Notwithstanding the Verdict pursuant to TENN. R. CIV. P. 50.02, or in the alternative pursuant to TENN. R. CIV. P. 59 for an order granting a new trial filed by the Plaintiff, Clinton O. Thornton, Jr. Counsel for the Plaintiff and Defendant, were present, and upon Motion and Response filed by Defendant in opposition to the Motion, arguments of counsel and the entire record, the Court states:

It is **ORDERED, ADJUDGED and DECREED** that the Judgment following the jury verdict entered on August 24, 2010, be set aside and an order notwithstanding the verdict be entered that the Last Will and Testament of Bessie Thornton be held invalid. The Court finds the evidence showed that

Nan Kimbro held a confidential relationship with the decedent, Bessie Louise Thornton, and that the Will admitted for probate was the result of undue influence upon the decedent by Nan Kimbro.

It is further **ORDERED ADJUDGED and DECREED** that the order probating the Last Will and Testament be set aside and Nan Kimbro is hereby removed as Executrix.

The Court made specific findings of fact and conclusions of law on the record and those findings are attached hereto and are hereby incorporated into this Order.

This appeal by Ms. Kimbro followed in which she asserts that the grant of judgment notwithstanding the verdict should be set aside and the jury's verdict reinstated because the trial court applied an incorrect legal standard, it impermissibly weighed the evidence, and sufficient evidence was presented to the jury to create an issue of fact for the jury to decide.

**ANALYSIS**

I.
Will Contests

The issues presented require us to first examine the parameters of a will contest. At the time a will is executed, the mind of the testatrix must be sufficiently sound to enable her to know and understand the force and consequence of the act of making the will.[1] *In re Estate of Elam*, 738 S.W.2d 169 (Tenn. 1987); *Am. Trust & Banking Co. v. Williams*, 225 S.W.2d 79, 83 (Tenn. Ct. App. 1948). A person executing a will must know and understand: (1) the nature and the effect of her act; (2) the property she possesses; and (3) the manner in which

---

[1]The mental condition of the testator at the time of executing the will is the only point of inquiry; but evidence of mental condition before and after making the will, if not too remote in point of time, may be received as bearing upon that issue. *In re Estate of Elam*, 738 S.W.2d 169, 171-72 (Tenn. 1987). Evidence of the testator's physical condition before and after the date of the will is also admissible; however, apart from its effect upon the mind, the physical condition of the testator has no bearing on the issue. *Id.* at 172 (citing *Taliaferro v. Green*, 622 S.W.2d 829, 834 (Tenn. Ct. App. 1981)). Although evidence regarding factors such as physical weakness or disease, old age, blunt perception or failing mind and memory is admissible on the issue of testamentary capacity, it is not conclusive and the testator is not thereby rendered incompetent if her mind is sufficiently sound to enable her to know and understand what she is doing. *Id.* The opinions of lay witnesses are admissible on soundness of mind if they are based on details of conversations, appearances, conduct or other particular facts from which the state of mind may be judged. *Id.* (citing *Am. Trust & Banking Co. v. Williams*, 225 S.W.2d 79, 84 (Tenn. Ct. App. 1948)).

her property will be distributed under the will. *Childress v. Currie*, 74 S.W.3d 324, 328 (Tenn. 2002); *In re Estate of Elam*, 738 S.W.2d at 171-72; *In re Estate of Price*, 273 S.W.3d 113 (Tenn. Ct. App. 2008). However, executing a will requires less mental capacity than engaging in business transactions. *Owen v. Summers*, 97 S.W.3d 114, 125 (Tenn. Ct. App. 2001); *Green v. Higdon*, 870 S.W.2d 513, 522 (Tenn. Ct. App. 1993).

Once the proponent of the will establishes its due execution, the contestant has the burden to prove by a preponderance of the evidence that the testatrix lacked testamentary capacity, or that her will was the result of undue influence exerted upon her by another. *In re Estate of Elam*, 738 SW.2d at 171 (citing *In re Estate of Rhodes*, 436 S.W.2d 429, 435-36 (Tenn. 1968)). As a general rule, it is presumed that undue influence does not enter into the making of a will and the burden of proving undue influence falls upon the person contesting the will. *Kelley v. Johns*, 96 S.W.3d 189, 196 (Tenn. Ct. App. 2002); *In re Estate of Maddox*, 60 S.W.3d 84, 89 (Tenn. Ct. App. 2001).

Undue influence "upon a testator consists in substituting the will of the person exercising it for that of the testator." Jack W. Robinson, Sr., & Jeff Mobley, *Pritchard on the Law of Wills and the Administration of Estates* § 124, at 203 (5th ed. 1994). Thus, the dispositive issue on a question of undue influence is whether "the will is the will of the testator or that of another." *Id.* § 130, at 210. "[I]t is not influence that vitiates a will, but *undue influence . . . ." Union Planters Nat'l Bank v. Inman*, 588 S.W.2d 757, 761 (Tenn. Ct. App. 1979)(emphasis added). The issue of undue influence should "be decided by the application of sound principles and good sense to the facts of each case." *Childress,* 74 S.W.3d at 329 (citing *Matlock v. Simpson*, 902 S.W.2d 384, 388 (quoting *Halle v. Summerfield*, 287 S.W.2d 57, 61 (Tenn. 1956))).

While undue influence can be proved either by direct or circumstantial evidence, *see In re Depriest's Estate*, 733 S.W.2d 74, 78 (Tenn. Ct. App. 1986), direct evidence is rarely available. *Hager v. Hager*, 66 S.W.2d 250, 260 (1933). Thus, in most cases, those attacking a conveyance on the grounds of undue influence must prove the existence of suspicious circumstances warranting the conclusion that the person allegedly influenced did not act freely and independently. *Fell v. Rambo*, 36 S.W.3d 837, 847 (Tenn. Ct. App. 2000). The suspicious circumstances most often relied upon to establish undue influence are: (1) the existence of a confidential relationship between the grantor and the beneficiary at the time of the conveyance;[2] (2) the grantor's physical or mental deterioration; and (3) the beneficiary's active involvement in procuring the conveyance. *In re Estate of Elam*, 738 S.W.2d at 173; *Kelly v. Allen*, 558 S.W.2d 845, 848 (Tenn. 1977); *Mitchell*, 779 S.W.2d at

---

[2]The existence of a confidential relationship is one of the "suspicious circumstances" most frequently relied upon to show undue influence. *Fell*, 36 S.W.3d at 847-48; *Kelly*, 558 S.W.2d at 848.

388; *Taliaferro*, 622 S.W.2d at 835-36. Other suspicious circumstances giving rise to undue influence include: (1) secrecy concerning the will's or conveyance's existence; (2) the grantor's advanced age; (3) the lack of independent advice in preparing the conveyance; (4) the grantor's illiteracy or blindness; (5) the unjust or unnatural nature of the conveyance; (6) the grantor being in an emotionally distraught state; (7) discrepancies between the conveyance and the testator's expressed intentions; and (8) fraud or duress directed toward the grantor. *Halle*, 287 S.W.2d at 61-62; *Mitchell*, 779 S.W.2d at 671.

In Tennessee, where there is a "confidential relationship, followed by a transaction wherein the dominant party receives a benefit from the other party, a presumption of undue influence arises, that may be rebutted only by clear and convincing evidence of the fairness of the transaction by clear and convincing evidence."[3] *Matlock*, 902 S.W.2d at 386; *see also Mitchell*, 779 S.W.2d at 389 (finding that a confidential relationship exists combined with the beneficiary's involvement in the procurement of the will or conveyance gives rise to a presumption of fraud or undue influence).

The jury in this case made a finding that a confidential relationship existed between Ms. Kimbro and the decedent.[4] As a consequence of this finding, the burden shifted to Ms. Kimbro to prove, by clear and convincing evidence, that the contested will was not the product of undue influence but, instead, was the product of the free exercise of independent judgment by the decedent. *See In re Estate of Elam*, 738 S.W.2d at 171. One means of showing a transaction's fairness is for the dominant party to establish, by clear and convincing evidence, that the weaker party received independent advice before consummating the transaction that benefitted the dominant party. *See Hogan v. Cooper*, 619 S.W.2d 516, 519 (Tenn. 1981); *see also Richmond v. Christian*, 555 S.W.2d 105, 107-08 (Tenn. 1977) (proof that the donor received independent advice respecting the consequences and advisability of the gift).

---

[3]Thus, the burden of proving that a confidential relationship exists rests upon the party claiming the existence of such a relationship. *Childress*, 74 S.W.3d at 328 (citing *Brown v. Weik*, 725 S.W.2d 938, 945 (Tenn. Ct. App. 1983)). As the contestant, Mr. Thornton bore the initial burden of proof.

[4]In general, a confidential relationship is any relationship which gives a person dominion and control over another. *Kelly*, 558 S.W.2d at 848. It is not merely a relationship of mutual trust and confidence, rather a confidential relationship is one where confidence is placed by one in the other and the recipient of that confidence is the dominant personality, with ability, because of that confidence, to exercise dominion and control over the weaker or dominated party. *Childress*, 74 S.W.3d at 328. Ms. Kimbro does not dispute that she had a confidential relationship with the decedent.

## II.
## Tenn. R. Civ. P. 50.02 and 59

We now turn our attention to the principles that apply when a party files post-trial motions to set aside a jury's verdict and enter judgment notwithstanding the verdict pursuant to Rule 50.02, or, in the alternative, for a new trial pursuant to Rule 59, of the Tennessee Rules of Civil Procedure. The relevant criteria for post-trial motions filed pursuant to Rule 50.02 and Rule 59 were discussed at length by our Supreme Court in 1977 in the matter of *Holmes v. Wilson*, 551 S.W.2d 682, 686 (Tenn. 1977). As for a Rule 50.02 motion for judgment notwithstanding the verdict, the Court explained:

> A post-trial motion for the entry of judgment in accordance with a motion for a directed verdict made during the trial must be gauged by the usual rules relating to directed verdicts. *Those rules require that the trial judge, and the appellate courts, take the strongest legitimate view of the evidence in favor of the opponent of the motion, allow all reasonable inferences in his or her favor, discard all countervailing evidence, and deny the motion where there is any doubt as to the conclusions to be drawn from the whole evidence.* A verdict should not be directed during, or after, trial except where a reasonable mind could draw but one conclusion.

*Id*. (emphasis added) (internal citations omitted).

Ms. Kimbro insists the trial court applied an incorrect legal standard by weighing the evidence when ruling upon Mr. Thornton's Rule 50 Motion for a Judgment Notwithstanding the Verdict. On this point we agree with Ms. Kimbro. Directed verdicts "are available in will contests to the same extent that they are available in other civil cases." *Mitchell v. Smith*, 779 S.W.2d 384, 387 (Tenn. Ct. App. 1989). Thus, the trial judge was required to apply the very deferential standard stated in *Holmes*, and was not permitted to "weigh the preponderance of the evidence." 551 S.W.2d at 685. The trial court held that while Ms. Kimbro presented some evidence, namely the independent advice of Attorney Callis, that evidence was insufficient to overcome her burden to produce clear and convincing evidence the will was not the product of undue influence. In so holding, the trial court impermissibly considered countervailing evidence and considered the weight of the evidence presented by Ms. Kimbro. *See id.*

This was error because the countervailing facts present a jury question concerning the issue of undue influence; specifically, whether the evidence presented by Mr. Kimbro clearly and convincingly shows that Ms. Kimbro did not exert undue influence over the decedent in

-10-

the procurement of the will. *Matlock*, 902 S.W.2d at 386. There is proof in the record that the decedent maintained her mental faculties despite her deteriorating physical state and increased need for medical care. There is also proof the decedent had a difficult relationship with her son in her later years, especially with regard to her property and her home, as well as proof Ms. Kimbro and the decedent were friends who shared common interests, and that Ms. Kimbro cared for the decedent's dogs and neighborhood strays when the decedent became unable, which was very important to the decedent. Attorney Callis, whom the trial judge found competent and responsible in assisting the decedent in the preparation of her will, testified that he met with the decedent outside of Ms. Kimbro's presence. He questioned her motives for leaving her property to Ms. Kimbro instead of Mr. Thornton, and was satisfied with her explanation. Taking "the strongest legitimate view of this evidence" in favor of Ms. Kimbro, "allowing all reasonable inferences" in her favor, and "discarding all countervailing evidence," we find "reasonable minds" could draw more than one conclusion as to whether the decedent's will was the product of a fair transaction or whether it was the product of undue influence on the part of Ms. Kimbro. *See Holmes*, 551 S.W.2d 686. Therefore, the trial court erred by entering judgment notwithstanding the verdict declaring the will of the decedent invalid.

Our decision does not, however, require reinstatement of the jury's verdict. To understand why, once again we look to the Court's ruling in *Holmes*. The jury in *Holmes* awarded the plaintiff damages of $28,000. *Id.* at 684. The defendant filed post-trial motions for judgment notwithstanding the verdict and, alternatively, for a new trial. *Id.* The trial court first granted the defendant's motion for a judgment notwithstanding the verdict, but failed to rule on the defendant's alternative motion for a new trial. *Id.* In the first appeal, the matter was remanded by this court for consideration of the motion for a new trial, pursuant to Rule 50.03 which expressly mandates that, when a judgment notwithstanding the verdict is granted and provided the movant alternatively asks for a new trial, *the trial court shall also "conditionally" rule on the motion for a new trial. See* Tenn. R. Civ. P. 50.03. On remand, the trial judge "made it clear that he was totally dissatisfied with the verdict of the jury" and granted a conditional new trial. *Holmes*, 551 S.W.2d at 684. In the second appeal, the court of appeals reversed the trial court's grant of a judgment notwithstanding the verdict as well as the conditional grant of a new trial, and remanded the case with instructions to reinstate the jury verdict. *Id.* The Tennessee Supreme Court agreed the trial court erred by entering judgment notwithstanding the verdict, concluding, as we have here, that a jury question was presented. However, the supreme court found the court of appeals erred in reinstating the jury verdict, and held that the case had to be remanded for a new trial because the trial court conditionally granted a new trial. *Id.* at 684-85. The reasons for the court's holding were explained by Justice Joseph W. Henry as follows:

*When a trial judge sustains a motion for judgment n. o. v., Rule 50.03 mandates that he also rule on the alternative motion for a new trial, indicating the grounds for granting or denying the motion.*

It must be borne in mind that the grant of a new trial was conditional and becomes effective only if the trial judge's action in granting judgment is reversed. This conditional grant of a new trial under Rule 50.03 does not affect the finality of the judgment, and an appeal lies to review it. If the appellate court affirms the judgment n. o. v. the controversy is ended. This follows from the fact that the grant of a new trial was conditional and does not become operable unless and until the judgment is reversed or vacated on appeal. *If [the appellate court] reverses the judgment, the grant of the motion for a new trial springs to life, and the case is remanded for a new trial, "unless the appellate court has otherwise ordered."*

We are not concerned with the correctness of the trial judge's action in awarding a conditional new trial. *Having expressed his dissatisfaction with the jury verdict, in his capacity as thirteenth juror, his action in awarding a new trial is not reviewable, and the only issue before the appellate courts is his action in entering judgment n. o. v.*

*Id.* at 684-85 (citations omitted) (emphasis added).

Like the Tennessee Supreme Court concluded in *Holmes*, we have determined the judgment notwithstanding the verdict was improper, and we must now decide whether the case should be remanded for a new trial or the verdict of the jury reinstated. *See id.* To resolve this issue, we must determine the effect of the trial court's failure to render an express ruling on Mr. Thornton's alternative motion for a new trial, which reads, "[a]s grounds to set aside the verdict, enter a judgment notwithstanding the verdict or for a new trial, the Plaintiff states that the jury verdict is against the weight of all the evidence."

When, as here, the trial court is faced with "a motion for a new trial asserting that the verdict is against the weight of the evidence, [it] is called upon to independently weigh the evidence and determine whether it preponderates in favor or against the verdict." *Cooper v. Tabb*, 347 S.W.3d 207, 220 (Tenn. Ct. App. 2010) (citations omitted). This is known as the "thirteenth juror rule," and it requires the trial judge to weigh the evidence, and if the trial judge is dissatisfied with the verdict of the jury, it should be set aside. *Id.* When ruling upon a motion for a new trial, the trial court "has such broad discretion that it is not bound to give reasons for its action in granting or denying a new trial based on the preponderance of the evidence." *Id.* (citations omitted). If the trial court approves the jury verdict without

-12-

comment, we will presume "that the trial judge has adequately performed his function as the thirteenth juror." *Id.* (citing *Holden v. Rannick*, 682 S.W.2d 903, 905 (Tenn. 1984)). However, "if it appears from any reasons assigned or statements made in passing on a motion for a new trial that the trial judge was not actually satisfied with the verdict, it is the duty of the appellate courts to grant a new trial." *Cooper*, 347 S.W.3d at 221 (quoting *Mabey v. Maggas*, No. M2006-02689-COA-R3-CV, 2007 WL 2713726, at *6 (Tenn. Ct. App. Sept. 18, 2007)).

The trial court failed to expressly rule on the motion for a new trial; nevertheless, when we examine the comments made by the trial court when ruling from the bench, the trial court's dissatisfaction with the jury's verdict is clear. Furthermore, as *Holmes* instructs, if the trial court grants a motion for a directed verdict or judgment notwithstanding the verdict, "consistency demands that there be a conditional award of a new trial." *Holmes*, 551 S.W.2d at 685. Accordingly, we hold that the trial court by implication conditionally awarded the contestant a new trial.

Because we have reversed the entry of a judgment notwithstanding the verdict, the conditional grant of the motion for a new trial has sprung to life. *Holmes*, 551 S.W.2d at 685. Accordingly, the case is remanded for a new trial.

### IN CONCLUSION

The decision of the trial court to enter judgment notwithstanding the verdict is reversed and this matter is remanded for a new trial. Costs of appeal are assessed against the parties equally.

_____
FRANK G. CLEMENT, JR., JUDGE

-13-