# IN THE COURT OF APPEALS OF TENNESSEE
## AT KNOXVILLE
August 26, 2015 Session

## JOEL A. CONKIN, ADMINISTRATOR WITH WILL ANNEXED OF THE ESTATE OF MATTIE L. METTETAL v. RAY W. METTETAL, JR., M.D., ET AL.

### Appeal from the Chancery Court for Washington County
No. 41871     John C. Rambo, Chancellor

---

### No. E2015-00141-COA-R3-CV-FILED-DECEMBER 17, 2015

---

Ray W. Mettetal, Jr., M.D. ("Dr. Mettetal") and Ray W. Mettetal, Jr., M.D., Inc. ("Corporation") appeal the judgment of the Chancery Court for Washington County ("the Trial Court") finding and holding, *inter alia*, that Dr. Mettetal breached his fiduciary duty to Mattie L. Mettetal ("Deceased"), improperly converted Deceased's funds to his benefit and the benefit of his Corporation, and failed to show that the funds were in keeping with gifts pursuant to Tenn. Code Ann. § 34-6-110. We find and hold that the evidence does not preponderate against the Trial Court's findings, and we affirm.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Chancery Court Affirmed Case Remanded

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which CHARLES D. SUSANO, JR., C.J. and JOHN W. MCCLARTY, J., joined.

Harry Curtis Williams, Johnson City, Tennessee, for the appellants, Ray W. Mettetal, Jr., M.D. and Ray W. Mettetal, Jr., M.D., Inc.

Richard M. Currie, Jr., Kingsport, Tennessee, for the appellee, Joel A. Conkin, Administrator With Will Annexed of the Estate of Mattie L. Mettetal.

# OPINION

## Background

Dr. Mettetal is Deceased's son. In August of 2002, Deceased executed a Durable Power of Attorney naming Dr. Mettetal as her attorney-in-fact ("Power of Attorney"). Deceased suffered a stroke in August of 2007, which rendered her incompetent. After Deceased's stroke, Dr. Mettetal utilized the Power of Attorney to conduct numerous transactions involving Deceased's money directly benefitting himself and his Corporation.

Deceased died in December of 2009. Deceased's Last Will and Testament ("the Will") was admitted to probate in February of 2010, and Joel A. Conkin was named Administrator with Will Annexed of the Estate of Mattie L. Mettetal ("the Administrator").

The Administrator sued Dr. Mettetal and his Corporation in November of 2012 alleging, in part, that Dr. Mettetal had breached his fiduciary duty to Deceased and committed conversion of Deceased's property. The Trial Court bifurcated the trial first hearing the issue of whether Dr. Mettetal had breached his fiduciary duty to Deceased and improperly converted Deceased's property. After the first phase of trial the Trial, Court entered its judgment on December 17, 2013 finding and holding, *inter alia*, that Dr. Mettetal had breached his fiduciary duties to Deceased, that expenditures of Deceased's funds after Deceased's stroke on August 14, 2007 for the benefit of Dr. Mettetal and his Corporation raised a presumption of undue influence, and that Dr. Mettetal and the Corporation had failed to rebut the presumption with clear and convincing evidence of the fairness of the transactions and had failed to prove that the funds were gifts pursuant to Tenn. Code Ann. § 34-6-110. During the second phase of trial, the Trial Court heard evidence with regard to the amount of Deceased's money that Dr. Mettetal had converted to his own benefit and the benefit of his Corporation.

Mattie Angelique Phipps, Deceased's adult granddaughter, testified at trial. Ms. Phipps testified that she is a forty-two year old pharmacist who works in Hillsville, Virginia. Ms. Phipps stated that Deceased was "more like a mother to me. . . . [S]he helped in my raising, so to speak, and she was always a good role model for me. She was a very smart business person, a very strong woman, always a leader." Ms. Phipps admitted that Deceased had helped her to obtain an education and testified that Deceased probably had given her $8,000 to $10,000 to assist Ms. Phipps to obtain her education.

Ms. Phipps testified that Deceased had told her:

2

She never, ever wanted to leave her home. In fact, I had built a three story house in Galax and I wanted her to come live with me, because nobody was really around after my grandfather died [in 1996], to take care of her. And she refused because she wanted to stay in her home, even though she would've had an entire floor to herself.

Ms. Phipps testified that Deceased never returned to her own home after she had the stroke. Deceased spent a brief period of time in a nursing home after the stroke and then spent the remainder of her life living on a couch in Tammy Cash's trailer in a trailer park. Ms. Phipps was asked how Deceased came to live in Ms. Cash's trailer, and she stated:

There was some question about something that had happened at the nursing home, potential maybe for abuse, and I had discussed with my uncle about moving her to another facility. Actually, I discussed with him moving her back to her home or to the rental property and having people look after her around the clock. But he said he could not find anybody to give her that kind of care. And then she was placed in a trailer with Tammy.

Ms. Phipps was asked about the conditions in Ms. Cash's home, and she stated:

The conditions were very poor. She had two children and a husband. Like I said, my grandmother had to stay essentially in her living room area. As soon as you came in through the front door, that's where my grandmother stayed. And pretty much she stayed on a couch. She did not have a hospital bed or anything like that.

Ms. Phipps was asked to describe Deceased's condition during the time Deceased lived in Ms. Cash's trailer, and she stated:

She was unable to talk. She had to be, you know, pulled up for assistance to walk. She was pretty much helpless. She had to be fed. You know, she would try to feed herself, but it was very difficult for her. It was, it was very pitiful. . . . She did not speak.

Ms. Phipps also testified that Deceased could not write at that time.

When asked if Deceased had ever spoken to her about the money Deceased spent on Dr. Mettetal's behalf, Ms. Phipps stated: "Yes. She said, 'Once he gets his license [to practice medicine] back, he'll be able to repay me and help me with the bills here at the house.'" Ms. Phipps testified:

3

[Dr. Mettetal] regained his first licensure back in Virginia, like in 2006, I believe. And then Tennessee was shortly after that, I believe in 2007. It was about, I'm going to say, four months probably before she had her stroke that he got his license back and she was extremely excited, because she was, she was so proud that he had overcome his, you know, interment in prison and everything. And then, you know, he had kind of redeemed himself a little bit by getting his license back and she said, "Now, you can, you know, start contributing back once you get a job." So she was pretty excited . . . [.]

Ms. Phipps testified that during that time period she tried to visit Deceased once a month or more.

Dr. Mettetal testified that he was sixty-two years old at the time of trial. Dr. Mettetal is licensed to practice medicine in both Virginia and Tennessee and is board certified in medical neurology. He testified that he practices medicine five days a week.

Dr. Mettetal graduated from the University of Tennessee medical school in Memphis in 1977 and then did a year-long internship at Baptist Hospital in Memphis. He testified that he then practiced in Mississippi as an emergency medicine physician for a year, spent two years at the National Institutes of Health doing research on brain tumors, and then did a residency at Vanderbilt's Department of Neurology. Dr. Mettetal also did a year of neurosurgery residency. Dr. Mettetal took some time during the residency programs to work in emergency medicine. He testified that he then went to Charlottesville, Virginia and did a fellowship involving the treatment of stroke patients. Dr. Mettetal spent approximately three years in Charlottesville. He then worked as a neurologist in Harrisonburg, Virginia.

Dr. Mettetal admitted that he was arrested outside of Vanderbilt Hospital in August of 1995. He was wearing a wig and a false beard when arrested. Dr. Mettetal was held in Tennessee for a short time and then transferred to federal custody in Virginia. Dr. Mettetal then spent approximately six years alternating between state and federal custody. He then spent approximately a year and a half on supervised probation before the Court of Appeals for the Fourth Circuit vacated his sentence. Dr. Mettetal admitted that after he was arrested police obtained search warrants and searched his property in Virginia, and as a result Dr. Mettetal was tried and convicted of possession of a toxin and possession of false identity documents. His conviction later was overturned, and Dr. Mettetal was tried and convicted again. Eventually, the Court of Appeals for the Fourth Circuit determined that there had not been probable cause to arrest Dr. Mettetal and,

4

therefore, the evidence from the searches was inadmissible, and Dr. Mettetal's convictions were vacated.

In February of 2002 after being released from jail, Dr. Mettetal went to live with Deceased. Dr. Mettetal testified that he had become estranged from his parents while he was in medical school in 1976 or 1977. Dr. Mettetal testified that his father had been a physician in general practice in Johnson City. Dr. Mettetal's father died prior to Dr. Mettetal moving in with Deceased in 2002. Dr. Mettetal moved in with his mother in 2002 when she was eighty-two years old and had health problems including macular degeneration, diabetes, hypertension, and osteoarthritis, but was mentally alert.

Dr. Mettetal testified that when he went to live with Deceased he "might have had, a couple, maybe $200.00 in my pocket, and that was a, a gift from somebody." Dr. Mettetal was asked if Deceased paid his expenses when he moved in with her, and he stated: "She really did. I, I could have gotten a job doing menial labor or something like that, but she, I was, I was more, of greater value to her, in terms of buying her groceries, paying her bills, taking her to her various genealogic meetings, taking her to church . . . four times a week." Dr. Mettetal testified that he had a credit card and that Deceased paid the monthly charges on this card.

At some point after he moved in with her, Dr. Mettetal began writing checks on Deceased's checking account for her. He testified that he would write the check and then would tell Deceased what the check was for and the amount and she would sign the check. Dr. Mettetal testified that Deceased did not have an ATM account when he moved in with her. He stated: "The day laborers, necessary to take care of her estate, you know, wanted, you know, of course, they wanted cash. And so we, Mother and I went together and had that ATM account established."

Dr. Mettetal admitted that under Deceased's Will he inherited Deceased's real estate and her home. Dr. Mettetal stated:

> The, the estate is, is, is twenty acres, so that the, the mowing and the, and there are miles of chain link fence to be maintained. There are acres of probably twenty, probably ten to fifteen of the twenty acres are, have to be mowed. It's, it's, and then also a lot of it is, is wooded, so that leaf collection is a huge issue. So, there's a great deal of labor. When I, when I arrived home some, I had somebody comment that, you know, it looked like nobody lived there. It, it's, even as a, a non-physically impaired adult it's a challenge to, to maintain the property.

When asked to describe the property, Dr. Mettetal stated:

5

Well, there is the five stable barn that my mom had for her Walking Horses, with a loft. It's, and it's approximately twenty-five feet wide and about seventy-five feet log [sic]. There's the two story brick house, in which Mother lived, which is probably a little less than thirty-five hundred square feet. And then there is a one story brick house that is probably about a thousand to twelve hundred square feet that used to be inhabited by a family friend called Rosalee Coleman, who was a, the first dietician at Memorial Hospital in Johnson City. And she, she was a single lady. And then also there are, there is a, probably, five or six hundred square foot, one bedroom apartment that's attached to the barn. And there's also two outbuildings, or three, I guess three additional minor structures.

Dr. Mettetal was asked if he used Deceased's funds to renovate, maintain, or improve the property, and he stated:

Yeah. A lot of, a lot of the property had what was, real estate agents called, deferred maintenance. The, there, there was, there were several buildings that were, the, the barn was about to collapse. It needed, and also the, the barn roof had, it had been decades and decades since, and it was leaking and, and causing problems. And the barn was also infested with powder post beetles. Her house needed a new roof and, you know, she really wasn't aware of that. And she had had leaks before. Her oil furnace to the house was totally inoperable. I mean, it had just over the years had just collapsed, the, the baking interior of it. The electrical wiring of the, the house, the breakers were so old that they weren't functional. They were dangerous. The driveway was in, hadn't been repaired in years, so that was another, that was another issue. The, probably five to ten acres had grown up in very thick undergrowth. The, there were dozens of ground hog holes that are, you know, the, the place was just infested. I mean, it was, it's just a big place to take care of.

Dr. Mettetal was asked about money spent on a playhouse on the property after Deceased had the stroke, and he explained:

The, the playhouse was built with leftover materials from the, from the two story brick home. And it was, it's been in existence since the early '50s, I think. The, the playhouse was the, the termites had destroyed the flooring. And of course, the roof was in bad repair. So there was some expense. And also the windows were in bad repair. So it, you know, was, it's a very

small structure. It's probably, you know, two hundred square feet. It's just a one room, basically a playhouse.

Dr. Mettetal testified that when he moved in with Deceased she only had been taking care of "basically her front yard, maybe two acres or so," and the remainder of the property was "in briars, honeysuckle, and plus you know, there's, you know, around twenty acres, that involves probably several miles of chain link fencing." Dr. Mettetal further stated: "So there's maintenance to be done on the land, even though it's wooded."

After Deceased had the stroke, Dr. Mettetal continued to live in Deceased's house. In 2007, 2008, and 2009, Dr. Mettetal paid approximately $100 a month to have someone clean the house. Dr. Mettetal admitted that he made numerous ATM withdrawals from Deceased's account for maintenance and repair of the property. He stated that he would pay the laborers who worked on the property by the day with the amount dependent upon the level of skill of the job. Dr. Mettetal testified that he paid the mechanics who took care of the engines like the weed eaters, leaf blowers, chain saws, and tractors $10.00 per hour. Dr. Mettetal paid around $7.00 per hour for raking leaves or mowing. For carpentry or painting Dr. Mettetal paid $14 to $17 per hour. Dr. Mettetal was asked if he ever paid any one worker more than $600 in a year, and he did not know. He testified that he never paid Social Security tax for any of the workers or provided them a Form 1099. In October of 2009 Dr. Mettetal paid $1,050.00 to strip, sand, paint, and provide hardware hinges for a barn door. He stated: "This was the original, original 1950 or '49 door that was on the, on the barn."

Dr. Mettetal wrote a check from Deceased's account in December of 2008 for $600.00 for stump grinding, replacing barn sink, and leaf removal. In January of 2009 Dr. Mettetal wrote a check for $300.00 from Deceased's account for mulching labor. He stated:

> And basically what that is is we've gathered up all of the limbs that have fallen down off of the property. We've, we've, and also any branches that were, some of the oak trees, you know, uprooted and fell over. So we cut the branches off, saved the branches, rented a machine from East Tennessee Rent-Alls and mulched them. So basically, that is just putting limb after limb after limb into this huge mulching machine that can mulch branches up to six inches.

Dr. Mettetal testified that the mulch then was put on flower beds on the property. Dr. Mettetal made an ATM withdrawal from Deceased's account in November of 2008 for $700.00, which was noted to be for leaf removal and barn light. When questioned about

this and asked whether he paid $7.00 per hour for one hundred hours for leaf removal, Dr. Mettetal stated:

> The barn was originally not well illuminated because, you know, it was just used for livestock and purposes of hay storage. I bought enough, I found, I found a source where I had, they were huge, they were surplus or used florescent lights like the ones in the Courthouse, this Courthouse ceiling. And I bought, I believe I put one in every stall and then I put five or more in the hallway and then I put another five or six in the, in the barn loft. And then I also, of course, that involved electrical wiring. So that, and the space, you know, provided, you know, that's, that's what that is.

Dr. Mettetal made an ATM withdrawal from Deceased's account in October of 2008 for $700.00 and made a notation that the withdrawal was for primer, painting and labor for the patio.

Dr. Mettetal testified about Deceased's stroke, which occurred on August 14, 2007. He explained that he placed Deceased into the car and alerted the hospital that they were on the way. He stated that during the drive to the hospital Deceased "just stopped talking to" him, and she never spoke again. Dr. Mettetal explained:

> The only way that she was able to communicate was she had, she had destroyed the expressive part of speech production. She still, I, the, the part, the, the receptive part of speech, being able hear [sic] speech, was still intact. And when you would talk to her, you could tell her facial expressions. For instance, when Angie would visit, you know, her, you know, her face would light up, or, and so I knew, you know, she, she knew, she could hear Angie's voice and knew Angie's voice. I, I don't think her, her sight was good enough to really say, you know, "This is Angie," although, she could see, make guesses from outlines. Another thing she would do is, I remember that she could express disapproval. For instance, I know we have a relative, her, a relative named Jan, her maiden name was Jan Wordlaw (phonetically), which was her brother's daughter, made the comment, visited from Mississippi and made the comment that she missed the last DAR meeting that was in her hometown in Mississippi and Mother would kick her leg up off of the bed when she said that.

Dr. Mettetal testified that an autopsy performed on Deceased showed no evidence of Alzheimer's.

8

Dr. Mettetal agreed that Deceased had a dread about going into a nursing home. When asked about what happened when Deceased got out of the hospital after having the stroke, Dr. Mettetal stated:

> The, I had asked, when it came time for her to come out of the hospital, she went through a series, she went to a skilled nursing unit at Quillen Hospital. And then she went to a, the Quillen Rehabilitation Hospital. And then I began asking other physicians for advice on the nursing homes. And, and I was told well, there, none of them are very good, but the, the, the least offensive of all of them are Colonial Hills or, and, and then they got sold to National Health Care Corporation.

Dr. Mettetal admitted that he began using the Power of Attorney after Deceased's stroke to make expenditures for Deceased, for her property, and for himself. Dr. Mettetal admitted writing checks on Deceased's account for his sole benefit including paying the charges for his credit card. He also loaned some of Deceased's money to his Corporation.

Dr. Mettetal wrote a check from Deceased's account in November of 2009 for his benefit related to an arbitration with Blue Cross Blue Shield. He wrote another check from Deceased's account in December of 2009 for $2,750.00 for arbitration with Blue Cross Blue Shield for his own benefit. Dr. Mettetal wrote a check for $1,250.00 from Deceased's account in December of 2009 for an American Arbitration Association file fee on his behalf. He wrote one from Deceased's account for $3,000.00 in December of 2009 for arbitration with Blue Cross Blue Shield for his benefit.

Dr. Mettetal made two loans of $5,000.00 each to his Corporation from Deceased's checking account. Dr. Mettetal admitted that he did not repay these loans. In October of 2009, Dr. Mettetal wrote a check for $2,000.00 from Deceased's checking account and deposited it into his Corporation account. Dr. Mettetal testified that he has not repaid that loan. In March of 2008, Dr. Mettetal wrote a check for $500.00 from Deceased's account, deposited it into his personal account, and notated that it was a loan.

Dr. Mettetal agreed that the Special Master's Report showed that in March of 2008 Dr. Mettetal charged $93.53 to his credit card for a diploma mat for the diploma of his great-grandfather. Also in March of 2008 Dr. Mettetal charged $37.21 for a shoe rack for himself. In January of 2009, Dr. Mettetal wrote a check from Deceased's account for $100 for a trip to Biltmore that he took with a church group. In February of 2009, Dr. Mettetal charged $63.33 to his credit card to frame a print. He explained:

> The, a close friend of the family was Clifford Maxwell. And he had, he

9

was a, and he used to be a photographer. He was an artist. And he had painted a, a historic theme, you know, for a wall, you know, a, a, depiction of a horse and buggy in front of a country inn. And that was in Mother's, that was given to my parents as a Christmas present. And so, you know, it had never been framed. So you know, I had it framed.

Dr. Mettetal testified that the framed Maxwell print is in Deceased's house.

Dr. Mettetal was asked about a check written in January of 2003 to pay for his Virginia medical license, and he admitted that he got his license back when that fee was paid "[t]emporarily," and stated that it was "a restricted license." When asked if he began practicing medicine in Virginia after he received this license, Dr. Mettetal stated:

No, Sir. I, the, the, nobody would, I went to several of the, the, the different hospitals in Southwest, under, serve regions of Southwest Virginia. And the corporations that own the hospitals said, "You know, we're not going to hire any doctor that had been in jail for that length of time and has not practiced medicine for that length of time." If you're a physician and you don't practice medicine for two years or more, you are automatically considered unemployable, un, unable to practice medicine until the Board of Medicine says you're, you're ready to practice.

Dr. Mettetal testified that he took steps such as getting continuing medical education to get back into good standing, but that he was not in a position where he could practice medicine in Virginia until February of 2013. He stated:

I, I see, I see you frowning at me. And I, I'll explain that to you. Number one, number one, I, I went to various hospitals in Southwest Virginia and, and even was going to work for, for a charity for nothing. There's something called the Welcome Wagon there that the, the nuns at Saint Mary's in Norton, Virginia had founded. And nobody would have anything to do with me, period, even if I worked free. It wasn't until February of, of 2013 that I was actually, could go to Virginia and have a place to work.

Dr. Mettetal was asked if he had considered opening his own practice when he had difficulty getting hired by hospitals in Virginia, and he stated:

No, I, no, I didn't. Simply because if I was, it's just so costly to, to, to open a practice and if I don't, basically I could, you cannot practice, practice medicine unless you have, I mean, you can practice medicine but you won't be reimbursed until the insurance companies agree to accept your

10

credentials. And I didn't have those credentials until March of 2007. . . . And then, even in March 2007, you still can't practice medicine if you have a license and you are accepted by the, and you won't be accepted by any of the insurance companies until you have malpractice insurance. And so I had to get malpractice insurance also. And then the, the State Volunteer Mutual has consistently refused to have any dealings with me.

Dr. Mettetal admitted that he received his Tennessee license in the mail in May of 2007. He testified that he began working:

July 19, 2007, I found a [sic] independently, working independently, meaning he wasn't a part of, he didn't have any partners, no group or anything. . . . Here in Johnson City. His name is [Gamal Butros], he's he describes himself as a [sic] Egyptian of Greek descent. . . . And he is, he's a medical neurologist and he decided that he would hire me to do his, you know, create a medical record of the visits of his patients, so that, to, to expedite his practice, so that he could see more patients and see them faster. So I began to work with Dr. Butros as, as basically a medical typist. And I think he gave me $7.00 per patient.

Dr. Mettetal admitted that in 2009 he was trying to set up his medical practice and that he had rented an exam room from another doctor and was practicing outpatient medical neurology. Dr. Mettetal continued working this practice through 2011 and then also began working on Fridays at an addiction treatment center. Dr. Mettetal was asked what he expected his income to be for 2013, and he stated: "I am working five days a week and I am making twenty to $30,000.00 a month." By January of 2013 Dr. Mettetal notified his patients that he would no longer be practicing neurology. He testified that he now practices addiction medicine and is working on obtaining a certification in this specialty. Dr. Mettetal stated that he had the continuing medical education credits and the actual practice hours necessary for certification and that he just needs to take the exam, which is given every two years.

Dr. Mettetal admitted that after Deceased's stroke he no longer needed to do things during the day for her like driving her places and preparing her meals. He stated:

But I still had to, I still visited her every day when she was in the various hospitals, nursing homes and at the Cash residence. And then when she was at the Cash residence, I also reviewed her, her vital signs, her blood glucose, . . . and took supplies, including her diapers, her various medicines to her and her tube feedings.

Dr. Mettetal testified that he arranged for Deceased to live with Tammy Cash. When asked how Deceased wound up living at Tammy Cash's house, Dr. Mettetal stated:

When I, when I, when I saw Mom was, after she had finished her rehabilitation from her stroke . . . . I realized that she was, was about to be transferred to a nursing home. I, even before this had anticipated this and was trying to set up the house so that I could get enough help and have a safe environment at her own home, to take care of the house. I was even, I'd even contacted Fleenor Security so that, to arrange the security so that the, the caregiver could come in to the front door and go back to the guest room where Mother would be living and they wouldn't be able to go and rummage through the rest of the house. And then I started calling as many people as I could. I found, the, I still have the index cards of the different people I called. And basically, I needed virtually twenty-four hour a day, thirty, you know, three hundred sixty-five days a year care for Mom, because her diapers needed to be changed, her glucose needed to be checked, blood pressure, tube feedings. And, and also somebody strong enough to take her back and forth to the restroom, because at that time she, she could walk with assistance to the, to the bathroom, to, for her to excrement. And I, I had talked to all of these people and I, I just was, none of them were, they wanted to work certain hours. Some of them were elderly themselves and didn't want to do anything that was physical, like help Mother back and forth to the bathroom. So, I was, had, had hit a brick wall. And a family friend, Sandra Maxwell, referred me to a lady who had cared for her elderly mother, who, who died with Alzheimer's disorder and cancer. And so, I thought well, if, you know, if she's going to recommend this person that cared for her mother, I'll at least look at it. The person was Tammy Cash. Tammy, I met Tammy and Tammy is a big, strong, strap, strapping woman. The first time I talked to Tammy, she was performing demolition construction at an apartment. So, I thought, well, you know, if it's somebody trustworthy and, and strong and willing to take on the task, you know, I'll, I'll certainly entertain that. Maybe I could get Tammy to do most of the work, taking care of Mom and then maybe get some others to help along the way.

Dr. Mettetal testified that he offered to let Tammy Cash live on Deceased's property in what is known as Rosalee Coleman's house, but Ms. Cash did not want to do this because she lived near her mother who was a dialysis patient. Dr. Mettetal stated that for the first twelve months he, Ms. Cash, and Ms. Cash's mother took care of Deceased and "did a good job." He admitted that after Ms. Cash's mother died "the last several months that, that Tammy took care of, or should have been taking care of my mom,

things were, things were not going well." Dr. Mettetal stated: "There were two children in the home and it was kind of an unusual situation to be living in a trailer, but she was doing a better job than the nursing homes." Dr. Mettetal was asked about the level of care that he stated had declined, and he testified:

> That, that's, that's correct and there's, there was, and it was hidden from me. The, I had, I have the notebook of the blood pressures, glucoses, blood and glucoses that had been taken accurately and correctly in the, in the first twelve months of her stay there. And thereafter, they were falsified. Also, another, another incident was, and this, this happened while Angie and I were visiting, Angelique Phipps . . . were visiting Mom, we noticed Mother was uncomfortable and we were going to look under my mom's diaper to see what was wrong. And Tammy Cash, you know, wouldn't, wouldn't let us. She said, "Oh, no, don't embarrass your mother like that. I'll take care of it." And it turned out that she had, Tammy had, was not informing me of Mother's decubitus bed sore, a death of tissue overlying her sacrum. And I had, and actually two weeks before I knew Mother was doing bad and I had actually taken her to the doctor about two weeks before, because I had suspected she had a urinary tract infection or another urinary tract infection or another pneumonia that we weren't picking up. And so that's, that's a true statement. And particularly, in, in retrospect I, I really didn't realize what was, since Mom couldn't talk she couldn't tell me and I would visit once a day and was being shown falsified data.

Dr. Mettetal admitted that Deceased had an investment account with a broker in North Carolina and an IRA both of which were with Wachovia Bank, which later became Wells Fargo. He further admitted that a letter from William Allen Winget dated February 21, 2008 addressed both to him and Deceased stated: "Dear Ray and Mattie, here's a review of how your portfolio has done and the rate of outflow. At the current outflow rate, funds will last about four more years. I realize that there are other assets she owns, but this is the liquid part." A letter from Mr. Winget dated December 16, 2008 stated: "Ray and Mattie, Just wanted to update you on Mattie's account. At the rate funds are going out, this account is empty in about plus/minus one and a half years out." Dr. Mettetal admitted that the statements for Deceased's investment account show that in 2006 the withdrawals were $88,385.00; in 2007 they were $94,800.00; and in 2008 they were $126,155.00. Dr. Mettetal admitted that he used money withdrawn from Deceased's investment account for repairs, renovations, and improvements to Deceased's property, for her expenses, and for his own expenses.

The Special Master found that of the total charges to the Estate of $64,432.99, Dr. Mettetal admitted that $56,092.63 was for his direct benefit. A portion of Dr. Mettetal's

13

deposition was read into the record at trial in which Dr. Mettetal stated: "I don't know the, what the amount is. I'm just saying that if I got money out of the Estate for my benefit, I'm willing to pay to repay that. I mean, that is, you know, I think that's fair." After further questioning during deposition, Dr. Mettetal was asked about his response to the Special Master's report: "Now is that the amount that you now say you feel should , you should repay the Estate?" and Dr. Mettetal responded "Yes, Sir, the amount of $56,092.63." When questioned at trial further about this Dr. Mettetal stated:

> [T]here's certain things, expenditures, that I knew she would make if she were present. For instance, you know, I didn't write any checks to the Barack Obama's campaign or any other Democrat. That, that wouldn't have been what she wanted. The, the other expenditures, it's like she had been, you know, she wanted me to pay her DAR dues, her genealogy dues. I paid those. You know, the power bill, the light bill and the upkeep of the thing, and she had helped me, she was trying to get me gainfully employed. And I continued in that, you know, in that vein. My plan was to, I never dreamed it would take me this long to be gainfully employed. And my plan was to, you know, while she was living, you know, pay this money back. But you know, also another thing to consider is when I gave my deposition to Mr. Currie, I had no idea of the statute that says about lifetime gifts. So I was only trying to be reasonable, in terms of the not expending legal fees for a cause that wasn't legally defensible. So that was the nature of my testimony, try, trying to be reasonable.

When asked if he tried to be fair when he made disbursements to himself Dr. Mettetal stated: "Yes, Sir. Yes, Sir. I, when I made these disbursements, I, I thought my mom was going to live to be a hundred and I was going to be gainfully employed and take care of her the rest of her days."

After trial the Trial Court entered its detailed Final Judgment on November 14, 2014 finding and holding, *inter alia*:

> Upon motion of Plaintiff, the Court bifurcated the trial. During the first phase of the trial, the Court found Defendants liable to the Mettetal estate for expenditures of Mrs. Mettetal's money made after August 14, 2007, by Dr. Mettetal. In the Court's order entered on December 17, 2013, the Court found the expenditure of Mattie L Mettetal's funds after August 14, 2007, accrued to the benefit of Dr. Mettetal and his Corporation. The Court further found that these expenditures constituted an illegal conversion of the property of Mattie L Mettetal and were in breach of Dr. Mettetal's fiduciary responsibilities to Mrs. Mettetal. The Court rejected

14

Defendants' arguments that payments for their benefit represented a continued course of gifting from Mrs. Mettetal upon Dr. Mettetal.

The Court conducted the second phase of the trial on February 2, 2014. The parties litigated, in light of the Court's previous liability holding, what amounts Dr. Mettetal should repay to the estate of his mother.

Dr. Ray W. Mettetal, Jr. was appointed Attorney-In-Fact for Mattie L. Mettetal by Power of Attorney executed on August 15, 2002. Mattie L Mettetal suffered a stroke on August 14, 2007, which rendered her incompetent. As the attorney-in-fact for his Mother, Defendant was obligated to handle her property honestly and loyally with the "utmost good faith." *Martin v. Moore,* 109 S.W.3d 305, 309 (Tenn. Ct. App. 2003). Defendant and his mother were in a confidential relationship, which is one "that gives one person the ability to exercise dominion and control over another." *Kelley v. Johns,* 96 S.W.3d 189, 197 (Tenn. Ct. App. 2002). A presumption arises from a confidential relationship that when a dominant party received a benefit from the other party, the dominant party used undue influence to obtain the benefit. *Richmond v. Christian,* 555 S.W.2d 105, 107 (Tenn. 1997). Where a presumption of undue influence arises, it may be rebutted only by clear and convincing evidence. *Matlock v. Simpson,* 902 S.W.2d 384, 386 (Tenn. 1995). The doctrine of undue influence is applicable only where there is a confidential relationship. *In re Estate of Brevard,* 213, S.W.3d 298, 302 (Tenn. Ct. App. 2006). Since the Court found that a confidential relationship exists, Defendants must present evidence to establish clearly and convincingly that the transactions by which he received benefits to the detriment of his mother met the required standard that he handled his mother's property honestly and loyally with the "utmost good faith." *In re Estate of Copas,* 2012 Tenn. App. LEXIS 41, *30 (Tenn. Ct. App. 2012)(quoting *Martin,* 109 S.W.3d 305, 309 (Tenn. Ct. App. 2003)).

The existence of a confidential relationship combined with a gift or benefit to the dominant party creates a presumption of undue influence and of the invalidity of the transaction. *Fell v. Rambo,* 36 S.W.3d 837 (Tenn. Ct. App. 2000). This presumption may be rebutted by clear and convincing evidence of the fairness of the transaction. *Hager v. Fitzgerald,* 937 S.W.2d 668 (Tenn. Ct. App. 1996).

Defendants assert that Mrs. Mettetal had established a personal

15

history of making lifetime gifts to Dr. Mettetal, and Dr. Mettetal's use of his mother's money constituted permissible performance of an act of gifting that the principal might or could do as authorized by his mother's power of attorney and TENN. CODE. ANN. § 34-6-110.

FINDINGS OF FACT AND CONCLUSIONS OF LAW

The testimony and evidence leads the Court to the conclusion that Mrs. Mettetal financially supported her son and spent money in an effort for him to regain his medical license for the purposes of his becoming economically productive and financially self-sufficient. Without his medical license and work as a physician, Dr. Mettetal could not achieve his full career potential. After the death of her husband and for approximately five years prior to her stroke, Mrs. Mettetal endeavored to support Dr. Mettetal and to help him regain his medical license. In return, Dr. Mettetal lived with his mother and looked after her. It was understandable that she would bestow financially upon her son under these circumstances.

Dr. Mettetal asserts that he simply continued to fulfill his mother's personal history of making lifetime gifts to him, and this is why he breached no duty of loyalty to his mother. However, there are two occassions [sic] that mark significant developments for Mrs. Mettetal and her son, and these events defeat Defendants' assertion that Dr. Mettetal was entitled to benefit from a continued course of gift-giving by Mrs. Mettetal, implemented by him as her attorney-in-fact. Circumstances changed in 2007, and the history of support and gift-giving ended in 2007. The Court reaches this conclusion because of these two significant milestones.

The first milestone occurred in July 2007, as Dr. Mettetal achieved licensures by this date from the Commonwealth of Virginia and the State of Tennessee to practice medicine. Based on the testimony and evidence at trial, the Court finds that Mrs. Mettetal had the expectation in July 2007 that her son would no longer require her financial assistance and that she now expected him to repay her for the financial investment she had made toward his professional rehabilitation. In short, the testimony and evidence at the November 25, 2013, trial convinces the Court that Mrs. Mettetal's sponsorship of Dr. Mettetal had succeeded by July 2007, and she now expected her son to repay her for her efforts. Mrs. Mettetal's gift-giving or support for her son had a purpose - to enable him to rejoin the medical community.

16

The Court finds that Mrs. Mettetal did not intend to continue to support her son after he had acquired medical licenses from Tennessee and Virginia. Her purpose was not to support her son indefinitely until her money and assets had dissipated. Her purpose in providing support and her course of gift-giving to her son ended immediately prior to her stroke.

The second milestone occurred in August 2007 when Mrs. Mettetal suffered her stroke. The Court finds that Dr. Mettetal's contention that his spending of his mother's money was a continued extension of his mother's pattern of gift-giving is unpersuasive. She had fulfilled her perceived obligation to her son, and Dr. Mettetal knew his mother's plan for his professional rehabilitation was to allow him to work again and, significantly, he knew her testamentary intent. With his regaining of his medical licenses and her debilitating stroke, the needs of the mother and son reversed. He now had the ability to support himself, and her stroke meant she needed to rely on her money and her son's loyalty given her fragile and debilitated medical condition.

The Court is convinced that Dr. Mettetal's motivation to continue to spend his mother's money was not in furtherance of his mother's desire to temporarily provide for him. Rather, Dr. Mettetal was motivated to use his powers as her attorney-in-fact to maximize his financial gain. Dr. Mettetal knew he was the sole beneficiary under his mother's will of her real property. Further, Dr. Mettetal and others were joint residual beneficiaries under her will. Thus, Dr. Mettetal stood to gain from the expenditures of money to improve the real property during Mrs. Mettetal's lifetime. As the sole beneficiary of the real property, the use of her money to improve the real property defeated the interests of the residual beneficiaries of the estate to the benefit of Dr. Mettetal by increasing the size of Dr. Mettetal's share of his mother's estate. Moreover, there was not pressing or contemporary need for the extensive rehabilitation of Mrs. Mettetal's real property. In fact, she neither comprehended or enjoyed the benefits of this work performance and expenditure of her money after her stroke. This course of spending had no relation to Mrs. Mettetal's condition. Rather, the Court finds that Dr. Mettetal intended to use as much of his mother's money as possible to gain the maximum financial advantage for himself to the detriment of his mother and the residual beneficiaries of his mother's Last Will and Testament. Stated another way, the Court finds Dr. Mettetal specifically set upon a course to spend his mother's money, which money he would not wholly inherit, to improve that portion of her estate that he would solely inherit and to support part of his personal expenditures during

17

the abbreviated remainder of Mrs. Mettetal's life.

After Mrs. Mettetal's stroke on August 14, 2007, she never returned to her home. Repairs and improvements to her real property accrued little to no benefit to Mrs. Mettetal. The Court finds that Dr. Mettetal set upon a course to improve and enhance the home, buildings, and real property of Mrs. Mettetal, because he desired to return them to their previous condition. These efforts were not made to stabilize or maintain an asset belonging to Mrs. Mettetal or to provide for her financial security.

Dr. Mettetal's conduct is further shocking in light of his mother's compromised health, physical immobility, and financial need. Instead of applying his mother's money to her comfort and care in her own home as she had been accustomed, Dr. Mettetal made appalling arrangements for Mrs. Mettetal's post-stroke care given the financial resources she had available to her. Dr. Mettetal's post-stroke care choices for his mother were made and selected because they represented cheap care and care that did not require Dr. Mettetal to be tethered to his helpless mother. Although his mother allowed her son to return home when he was unable to support himself; she received no such consideration from him. Although living off of his mother's money, living in his mother's home, and capable of providing home care for his mother, Dr. Mettetal sent his mother away from her home to live her last days on a stranger's sofa. Meanwhile, Dr. Mettetal busied himself with the use of his mother's money to improve the real property that he anticipated to shortly inherit.

Of the $64,432.99 sum the Special Master found chargeable to Dr. Mettetal, the Court finds Plaintiff is entitled to a judgment of $60,432.99 against Dr. Ray Mettetal, Jr. Of this judgment amount, Dr. Mettetal admitted that $56,092.63 found by the Special Master was for his benefit. . . . Dr. Mettetal disputes $8,340.36, which represents the difference between $64,432.99 and $56,092.63. Dr. Mettetal denies $8,340.36 was used for his benefit by asserting this difference constitutes a $4,000 deposit on February 11, 2008, to the account of Mrs. Mettetal, a $4,210.00 "difference in checking account," and the amount of 36 cents for "difference in loans."

As to the disputed $4,000 portion of the $8,340.36 difference, Dr. Mettetal asserts this amount is a loan repayment, while Plaintiff asserts the first loan to either Defendant occurred on March 7, 2008. The $4,000 deposit occurred on February 11, 2008. The Court finds this deposit was a repayment of attorney fees advanced by his mother to Dr. Mettetal.

Accordingly, the Court finds by clear and convincing evidence this $4,000 is not money missing from Mrs. Mettetal's account, but funds received from Dr. Mettetal for reimbursement of attorney fees.

Defendants failed to persuade the Court that a $4,210.00 "difference in checking" error occurred in the Special Master's calculation of the accounts of Mrs. Mettetal. Likewise, Defendants failed to provide persuasive evidence to establish a deduction for 36 cents in loan interest. The Court finds Defendants are not entitled to a credit of $4,210.00 for a difference in checking account or the 36 cents difference on Defendants' loans. The Court finds the Special Master was correct in attributing all but $4,000 of the $64,432.99 sum as chargeable to Dr. Mettetal as funds used for the benefit of Defendants. Plaintiff is entitled to a judgment of $60,432.99 against Defendants.

The Special Master found a total of $64,432.99 as charges attributable to the personal benefit of Dr. Mettetal, but found that an additional sum of $16,360 in checking account withdrawals were not expenses that benefited Dr. Mettetal. As to the $16,360.00 listed on Exhibit 2 to the Special Master's Report, the Court finds these were expenditures to Dr. Mettetal's benefit. The records presented as Exhibits 19, 21 and 22, and Dr. Mettetal's testimony are unconvincing that these funds were spent for the benefit of Mrs. Mettetal. These were consistent ATM lump-sum cash withdrawals with no receipts from manual laborers working on the improvements to the real property of Mrs. Mettetal. Reviewing the components of this $16,360, the Court finds Dr. Mettetal's explanation for spending $700 cash for tree surgery as unpersuasive. For similar services he paid in check instead of cash. Dr. Mettetal used checks, which are numbered 8553, 8682, 8684, 8948, 8955, 9054, 9064, 9074 and 9086, for a total of $10,395.00 for tree surgery, tree cutting, stump grinding and tree work. The Court fails to find any evidence that tree surgery benefited Mrs. Mettetal given her medical condition and care needs after her stroke.

Dr. Mettetal asserted that various ATM slips and check registers (Exhibits 19, 21, and 22) reflect cash withdrawals that were simply used for various day-to-day expenses mostly related to the upkeep of Mrs. Mettetal's real property, which was occupied by Dr. Mettetal. The Court rejects Dr. Mettetal's explanation and assertions related to the cash withdrawals. Frankly, this money was not used for Mrs. Mettetal's benefit. He did pay cash to some day laborers, and to buy meals, but he used cash withdraws [sic] from his mother's account as his own pocket money. The Court is not

19

persuaded that even a majority of the ATM and cash withdrawals went for the purpose of paying laborers as asserted by Dr. Mettetal, but even if Dr. Mettetal is to be believed, the work done by the laborers related to work to the real property that served no benefit to Mrs. Mettetal.

It was evident from the testimony [sic] Dr. Mettetal and his witnesses that Dr. Mettetal set upon a course to do as many improvements to the real property that he could accomplish before his mother's death. He was using money that was either going to be required for the use of her medical needs and upkeep or upon her death would be subject to a division among heirs to which he only partially shared in the money. It was Dr. Mettetal's plan to use his mother's money to improve the real property and grounds which benefit would exclusive [sic] accrue to him given his mother's Will. In her condition, she derived no benefit from these expenditures, but they did benefit Dr. Mettetal's efforts to improve the property for his anticipated benefit. Plaintiff is entitled to recover the entire $16,360 from Dr. Mettetal.

Moving from the cash expenditures to various disputed expenditures by check, the Court finds that Dr. Mettetal also paid attorney Olen Haynes for legal fees incurred related to Dr. Mettetal's dispute with BlueCross/BlueShield of Tennessee. These funds belonged to the estate of Mrs. Mettetal, and these expenditures were not incurred for the benefit of Mrs. Mettetal. The check expenditure to the American Arbitration Association for $2,750.00 and the check to Olen Haynes, attorney, for $3,000.00 written on Mattie Mettetal's account on December 22, 2009, relate to Dr. Mettetal's dispute with Blue Cross Blue Shield of Tennessee. They do not relate to the needs of Mrs. Mettetal after her stroke. Related to these expenditures, Plaintiff shall recover an additional $5,750.00 from Dr. Mettetal.

The final category of disputed amounts relate to certain disputed credit card charges. The Court finds that $621.18 of the credit card charges shown on Exhibit 1 of the Special Master's Report should be attributed to Dr. Ray Mettetal. These include $98.53 to Michael's for diploma mats, $37.21 to Bed, Bath and Beyond for a shoe rack, $169.70 to Advance Auto for repairs to Dr. Mettetal's Toyota, $184.91 to Advance for Toyota repairs, $63.50 to Advance Auto for Toyota repairs and $67.33 to Michaels [sic] frame for a Maxwell print. These were for the benefit of Dr. Mettetal, and these expenses accrued no benefit to Mrs. Mettetal. These were living expenses of Dr. Mettetal, and they were of no benefit to Mrs. Mettetal.

Plaintiff is entitled to recover the $621.18 from Dr. Mettetal.

SPECIAL MASTER'S FEE

Fees of $4,348.75 have been incurred for the work of the Special Master. These fees were reasonable and necessary, and they were ultimately incurred as a result of the estate successfully proving its case against Dr. Mettetal. The efforts of the Special Master identified numerous financial transactions that represented Dr. Mettetal's breach of his fiduciary duties to his mother as her attorney-in-fact. Although Dr. Mettetal acknowledges that $56,092.63 in expenditures accrued to his benefit, he has persisted in asserting throughout these proceedings that this sum represents a continuing course of gifts that continued after his mother's incapacitation. Dr. Mettetal never acknowledged he owed anything to his mother's estate, nor has he acknowledged any breach of duty of loyalty to his mother. To the contrary he unsuccessfully sought reimbursement of $40,057.35 from his mother's estate for bills incurred after his mother's death. He further attempted to revoke and redistribute the interest of Yvonne M. Rayburn, a beneficiary in the estate of Mattie L. Mettetal. The fees of the Special Master are taxed to Dr. Mettetal.

Dr. Mettetal and his Corporation appeal the Trial Court's judgment to this Court.

## **Discussion**

Although not stated exactly as such, Dr. Mettetal and his Corporation raise one issue on appeal: whether the Trial Court erred in finding that Dr. Mettetal improperly converted Deceased's funds for his own benefit and the benefit of his Corporation despite Dr. Mettetal's and the Corporation's assertion that the money represented gifts pursuant to Tenn. Code Ann. § 34-6-110.

Our review is *de novo* upon the record, accompanied by a presumption of correctness of the findings of fact of the trial court, unless the preponderance of the evidence is otherwise. Tenn. R. App. P. 13(d); *Bogan v. Bogan*, 60 S.W.3d 721, 727 (Tenn. 2001). A trial court's conclusions of law are subject to a *de novo* review with no presumption of correctness. *S. Constructors, Inc. v. Loudon County Bd. of Educ.*, 58 S.W.3d 706, 710 (Tenn. 2001).

With regard to the duties that an attorney-in-fact owes to the grantor of the power of attorney this Court has explained:

21

Our courts have long held that the execution of a power of attorney establishes a confidential or fiduciary relationship between the attorney in fact and the grantor of the power. *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995); *Mitchell v. Smith*, 779 S.W.2d 384 (Tenn. Ct. App. 1989); *Askew v. Askew*, 619 S.W.2d 384 (Tenn. Ct. App. 1981); *Black v. Pettigrew*, 38 Tenn. App. 1, 270 S.W.2d 196 (1953). Our Supreme Court has recently announced a narrow exception to this rule. In *Childress v. Currie*, 74 S.W.3d 324 (Tenn. 2002), the Court ruled that if the power of attorney is executed, but not exercised, a confidential relationship does not arise as a matter of law. This exception clearly does not apply in the present case.

Numerous opinions of our appellate courts have stated that the dominant party in a fiduciary relationship is obligated to deal with the property of the other party in the utmost good faith. *Estate of Doyle v. Hunt*, 60 S.W.3d 838 (Tenn. Ct. App. 2001); *Alexander v. Inman*, 974 S.W.2d 689 (Tenn. 1998); *McFarlin v. McFarlin*, 785 S.W.2d 367 (Tenn. Ct. App. 1989). Other cases have spoken of the duties of loyalty and honesty as also being a part of a fiduciary's obligation. *Roberts v. Iddins*, 797 S.W.2d 615 (Tenn. Ct. App. 1990); *Knox–Tenn Rental Co. v. Jenkins Ins., Inc.*, 755 S.W.2d 33 (Tenn. 1988).

Finally, the existence of a confidential relationship, combined with a gift or benefit to the dominant party, creates a presumption of undue influence, and of the invalidity of the transaction. *Fell v. Rambo*, 36 S.W.3d 837 (Tenn. Ct. App. 2000). This presumption is not conclusive, however, for it may be rebutted by clear and convincing evidence of the fairness of the transaction. *Hager v. Fitzgerald*, 934 S.W.2d 668 (Tenn. Ct. App. 1996); *Matlock v. Simpson*, 902 S.W.2d 384 (Tenn. 1995); *Bills v. Lindsay*, 909 S.W.2d 434 (Tenn. Ct. App. 1993); *Gordon v. Thornton*, 584 S.W.2d 655 (Tenn. Ct. App. 1979).

*Martin v. Moore*, 109 S.W.3d 305, 309-10 (Tenn. Ct. App. 2003).

Dr. Mettetal and his Corporation argue in their brief on appeal that there was no conversion of Deceased's funds because the money at issue constituted gifts under the Power of Attorney pursuant to Tenn. Code Ann. § 34-6-110. As pertinent to this appeal, Tenn. Code Ann. § 34-6-110 provides:

**34-6-110. Gifts under power of attorney.**

(a) If any power of attorney or other writing:

       (1) Authorizes an attorney-in-fact or other agent to do, execute or perform any act that the principal might or could do; or

       (2) Evidences the principal's intent to give the attorney-in-fact or agent full power to handle the principal's affairs or to deal with the principal's property;

then the attorney-in-fact or agent shall have the power and authority to make gifts, in any amount, of any of the principal's property, to any individuals, or to organizations described in §§ 170(c) and 2522(a) of the Internal Revenue Code (26 U.S.C. §§ 170 and 2522), or corresponding future provisions of the federal tax law, or both, in accordance with the principal's personal history of making or joining in the making of lifetime gifts. This section shall not in any way limit the right or power of any principal, by express words in the power of attorney or other writing, to authorize, or limit the authority of, any attorney-in-fact or other agent to make gifts of the principal's property.

Tenn. Code Ann. § 34-6-110(a) (2015).

We need not reiterate in full the Trial Court's detailed and specific findings, which are quoted more fully above. We note, however, that with regard to the arguments made by Dr. Mettetal and his Corporation with regard to gifting the Trial Court specifically found and held:

The Court rejected Defendants' arguments that payments for their benefit represented a continued course of gifting from Mrs. Mettetal upon Dr. Mettetal.

* * *

The testimony and evidence leads the Court to the conclusion that Mrs. Mettetal financially supported her son and spent money in an effort for him to regain his medical license for the purposes of his becoming economically productive and financially self-sufficient. Without his medical license and work as a physician, Dr. Mettetal could not achieve his full career potential. After the death of her husband and for approximately five years prior to her stroke, Mrs. Mettetal endeavored to support Dr. Mettetal and to help him regain his medical license. In return, Dr. Mettetal lived with his mother and looked after her. It was understandable that she would bestow financially upon her son under these circumstances.

23

Dr. Mettetal asserts that he simply continued to fulfill his mother's personal history of making lifetime gifts to him, and this is why he breached no duty of loyalty to his mother. However, there are two occassions [sic] that mark significant developments for Mrs. Mettetal and her son, and these events defeat Defendants' assertion that Dr. Mettetal was entitled to benefit from a continued course of gift-giving by Mrs. Mettetal, implemented by him as her attorney-in-fact. Circumstances changed in 2007, and the history of support and gift-giving ended in 2007. The Court reaches this conclusion because of these two significant milestones.

The first milestone occurred in July 2007, as Dr. Mettetal achieved licensures by this date from the Commonwealth of Virginia and the State of Tennessee to practice medicine. Based on the testimony and evidence at trial, the Court finds that Mrs. Mettetal had the expectation in July 2007 that her son would no longer require her financial assistance and that she now expected him to repay her for the financial investment she had made toward his professional rehabilitation. In short, the testimony and evidence at the November 25, 2013, trial convinces the Court that Mrs. Mettetal's sponsorship of Dr. Mettetal had succeeded by July 2007, and she now expected her son to repay her for her efforts. Mrs. Mettetal's gift-giving or support for her son had a purpose - to enable him to rejoin the medical community.

The Court finds that Mrs. Mettetal did not intend to continue to support her son after he had acquired medical licenses from Tennessee and Virginia. Her purpose was not to support her son indefinitely until her money and assets had dissipated. Her purpose in providing support and her course of gift-giving to her son ended immediately prior to her stroke.

The second milestone occurred in August 2007 when Mrs. Mettetal suffered her stroke. The Court finds that Dr. Mettetal's contention that his spending of his mother's money was a continued extension of his mother's pattern of gift-giving is unpersuasive. She had fulfilled her perceived obligation to her son, and Dr. Mettetal knew his mother's plan for his professional rehabilitation was to allow him to work again and, significantly, he knew her testamentary intent. With his regaining of his medical licenses and her debilitating stroke, the needs of the mother and son reversed. He now had the ability to support himself, and her stroke meant she needed to rely on her money and her son's loyalty given her fragile and debilitated medical condition.

24

The Trial Court further found that Dr. Mettetal was aware that he would be the sole beneficiary of Deceased's real property when she died and that "Dr. Mettetal intended to use as much of his mother's money as possible to gain the maximum financial advantage for himself to the detriment of his mother and the residual beneficiaries of his mother's Last Will and Testament." The evidence in the record on appeal, as discussed more fully above, does not preponderate against these findings made by the Trial Court.

The evidence in the record on appeal shows, as found by the Trial Court, that after her stroke Deceased never returned to her home and, therefore, was unable to enjoy the benefit of any of the numerous improvements made to her property by Dr. Mettetal. The evidence shows that Dr. Mettetal used Deceased's money for such things as a door, hinges, and lighting in a barn that was not even in use at that time; for stump grinding and tree work at the property to which Deceased never returned; for repairs to a playhouse; and for framing a diploma and art work, which then hung in the house, to which Deceased never was able to return. The Trial Court found that none of these expenditures had any benefit to Deceased. The evidence does not preponderate against this finding.

Furthermore, the Trial Court found that Dr. Mettetal's use of Deceased's money in the manner it was used was "shocking in light of his mother's compromised health, physical immobility, and financial need." It stretches credibility to think that Deceased intended to gift money to Dr. Mettetal to use in the manner in which he did when that money could have been, and should have been, used to provide for Deceased's immediate physical care and comfort after she suffered the stroke. The Trial Court said it best when it found that Dr. Mettetal instead "made appalling arrangements" consisting of "cheap care" when "Dr. Mettetal sent his mother away from her home to live her last days on a stranger's sofa." It is difficult, if not impossible, even to imagine an argument that this somehow was Dr. Mettetal dealing with Deceased's property in the utmost good faith as was required of him.

The evidence in the record on appeal simply does not preponderate against the Trial Court's findings that Dr. Mettetal improperly converted Deceased's funds for his own benefit and the benefit of his Corporation and that Dr. Mettetal and his Corporation failed to prove that the money at issue represented gifts under the Power of Attorney pursuant to Tenn. Code Ann. § 34-6-110. We, therefore, affirm the Trial Court's November 14, 2014 Final Judgment.

The Administrator raises an issue on appeal requesting an award of attorney's fees and expenses on appeal. While the Administrator makes an argument in his brief on appeal that such an award would be appropriate, he cites us to no legal authority whatsoever in support of his argument. It is not the role of this Court to do research for

the parties or to provide support for issues or arguments raised by the parties. As the Administrator's argument on this issue cites us to no legal authority as required, we decline to award the Administrator attorney's fees and expenses on appeal.

## **<u>Conclusion</u>**

The judgment of the Trial Court is affirmed, and this cause is remanded to the Trial Court for collection of the costs below. The costs on appeal are assessed against the appellants, Ray W. Mettetal, Jr., M.D. and Ray W. Mettetal, Jr., M.D., Inc., and their surety.


_____

D. MICHAEL SWINEY, JUDGE